## Nease v. Commonwealth.

April 23, 1948.

Rehearing denied June 25, 1948.

A. E. Funk, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

Opinion of the Court by Morris, Commissioner—Affirming.

On April 2, 1947, a grand jury returned an indictment charging appellant and two others (McPeak and Workman) with the offenses denounced by KRS 433.140, robbery by the use of a deadly weapon. When the case was called for trial appellant moved for severance and the Commonwealth elected to try him; the jury returned a death verdict.

In motion for new trial appellant set up only two grounds: (1) Because the court erred to his prejudice in admitting incompetent evidence against him and rejecting competent evidence offered on his behalf; (2) Because the verdict is contrary to the law and evidence.

The facts developed were that Vernon Hodges was last seen alive by relatives and friends on March 13, 1947. At a later date his body was recovered from the Kentucky River in Perry County. The feet were bound; a handkerchief tied around his neck, and he had on clothing not the same when he was last seen alive in Jefferson County.

A sister testified that Hodges had lived with her for some time after he came out of the Army in 1946, but at the time of his disappearance he lived with Mr. Steedly on Manslick Road. She was shown pictures of the deceased and identified and introduced them. She testified that her brother owned a convertible Packard car, with a cream color body and black top. She was shown a suit of clothes and a pair of shoes which she identified as the same he wore on the day of his disappearance. The effect of the testimony as to clothing and automobile will develop under other proof.

Mr. Steedly testified that Hodges had lived with him after his return from the Army. Hodges left his home about 7:00 p. m., March 13, driving his cream colored car to attend a lodge meeting. He identified the suit and shoes as the same he wore when he left home. Earl Elmore was a friend, a member of the Masonic Lodge, and was preparing Hodges for advancement to the third degree in the Lodge. Hodges had an engagement to come to his home on the night of the 13th, but failed to show up.

Prentice Knopf lived on Poplar Road, and at about 5:30 p. m. was driving into Louisville over the Old Third Street Road; it was raining, and he saw a boy thumbing for a ride. He stopped and two other boys came out from behind a tree and all three got in his car. He asked where they were going and they answered "Lexington." He told them he would take them as far as he intended to go. He drove in the Third Street road to its intersection with the New Cut Road, stopped in front of a grocery store and the boys got out. One of the boys had a rifle about the size of one exhibited which appeared to be an Army rifle. He identified Nease as one of the three who had ridden with him.

Kessling Hogg, a military police investigator, was doing duty in central and eastern Kentucky, Perry County being in the area. He learned of the holdup and disappearance of Hodges and agreed to assist local officers. The party located McPeak in Virginia. From him they learned the probable whereabouts of Nease, and looked for him, but he was found by another party. After Nease was apprehended he was taken from Whitesburg to Hazard, and on this trip he told Hogg that when they left Camp Knox they walked all night and got something to eat. They went out on the road and flagged Hodges down. McPeak stood in the road and Workman and Nease got in the car, Nease had the gun and held it on Hodges, while Workman got in the back seat. Nease then handed the gun to Workman, and he stuck the gun in Hodges' back and Nease got under the wheel. They picked up McPeak and drove over Route 60 to Perry County. He said that Nease said he held the gun on Hodges and held him up as the other boys got in the car; that they got out and took Hodges' clothing and shoes, and Nease put them on. Nease told him the holdup occurred at the intersection between Fort Knox and Louisville, the intersection referred to in Knopf's testimony. He learned that Hodges' body had been thrown into the river. Following this information he dragged the fork of the Kentucky River in Perry County and found Hodges' body. "He had on general prisoner's clothes which they wear at Fort Knox." He described how his feet were strapped.

He said that the pants, Army pants, looked like the ones that Hodges had on. He identified the shoes,

shirt and a fatigue jacket. He said that when he questioned Nease he had on slacks; that Nease told him that a rock had been tied to Hodges' body before throwing him in the river. He found the rock with an Army waist belt around it. He was shown a rifle or carbine and said it was a carbine used by the United States Army. He continued that Nease had told him he and his companions had painted the automobile black.

George Blades, a detective in the office of the Commonwealth's Attorney, was assigned for investigation of the case. He introduced pictures of the intersection of the Third Street Road and the New Cut Road. The witness said that while the Commonwealth's Attorney and his assistant were present, Nease had made the statement that he and the two others had robbed Hodges at the intersection; they held him up and took his car, drove to Perry County where Hodges was thrown in the river; that he, Nease, had the gun and that the three had conducted the assault as was detailed by Sergeant Hogg.

Blades said that Nease told them that they took some change and a check for $13 dated 3/5/47, payable to Hodges and drawn on the Lincoln Bank, Louisville, Ky. It was endorsed "V. C. Hodges," and cashed at the store of the A. & P. Company in Neon, Letcher County. This witness goes more into detail as to the journey from Louisville to Eastern Kentucky, but in substance the statements tally with those given by Hogg. There was no objection on the part of appellant's counsel to the testimony of either Hogg or Blades; on cross-examination Blades said the statements made in the presence of the other officers were freely made. "We asked him if he would tell us about the case and he said he would; there was no coercion; he just told these things without hesitancy." It appears that the statement was afterwards reduced to writing and signed by Nease, and Nease was told before signing that his answers would be used against him. That he was also told that he did not have to answer unless he chose to do so. Hogg was recalled for further identification of certain articles, and on cross-examination stated that Nease's statements were voluntarily made.

Nease was placed on the stand by his counsel, and

recited the story of the holdup and final disposition of Hodges. He cleared up some points that were not mentioned in Commonwealth's proof. For instance he told how Workman had taken a rifle (the one exhibited) from a guard at Fort Knox, and he and his companions effected their escape. He also made it clear that after taking charge of Hodges' car he had been bound and gagged, and that at some point on the journey toward Frankfort he and Hodges had changed clothing, at Workman's suggestion.

His testimony as to occurrences from the time of the holdup to the final act of the tragedy was substantially as stated by both Blades and Hogg, except that he insisted that from the start to the finish, Workman and McPeak were the principals. He was forced to drive the car; to change clothes with Hodges, and said that he objected to the throwing of Hodges into the river, and recounted how he had used his efforts to save Hodges, but this effort was thwarted by Workman, who from the first had kept possession of the Army carbine. However, under cross-examination it was apparent that at times he could have readily abandoned his companions on the long journey from Jefferson to remote Perry County.

He admitted that he had made statements to both Hogg and Blades, but insists that their statements were in part incorrect. He also said that his statements to Hogg were made through fear of a mob, which was being discussed in Perry County, and while he was being taken from Hazard to Winchester, but admitted that when he signed the statement referred to by Blades he was told before signing that it would be used against him. He admitted the taking of Hodges' car to his father's home where it was repainted, and that some of the three had theretofore changed the license plates. He also said that Hodges was bound and gagged soon after they held him up.

Appellant's brief does not point out any item of competent testimony offered by appellant, subjected to exception by the Commonwealth, and sustained by the Court. One witness for the Commonwealth was asked on cross-examination whether he had a criminal record, and the Court interrupted to suggest that the witness

might be asked if he had ever been convicted of a felony. Counsel then asked, "Will you tell the jury whether or not you have ever been accused * * *;" objection was interposed and sustained. There was no error here prejudicial or otherwise. When Blades was testifying he was asked if he had read the statements made by the three boys in Letcher County, and he said he had, and the Court ruled that any testimony as to statements made by codefendants was incompetent. We have checked the testimony and find no objections by appellant's counsel relative to the exclusion of testi-mony offered by the Commonwealth's witnesses.

Appellant complains that Hodges' sister was permitted to say that her brother went into the Army in 1942, and was discharged in 1946; that when he was a child he lived in an orphanage and was taken to the home of Mr. Steedly; that he was a member of the Baptist Tabernacle, and attended regularly; that he was buried March 26 in Evergreen Cemetery; that she saw his body at the funeral home. It may be admitted that these questions and answers were in fact irrelevant, though not brought out by repeated questions so as to unduly impress or bias the jury. The transcript shows no objection to any question asked or answered by the witness.

There were introduced several photographs of the deceased and of the automobile which had been repainted, and copies of registration certificates of Hodges' car. We find no objection to their introduction. In fact when the certificates were introduced the court asked if there was objection and counsel replied "No."

When Mr. Steedly was testifying he said that he had taken Hodges from the Children's Home where he helped him on his farm and attended school until he was 16 years old. Again this testimony appears irrelevant, but there was no objection except when Mr. Steedly said, "I sent him to school while he was at my place," appellant's counsel said "I object to all this," and the court said, "Let's don't go over this any more," and no exception was noted.

Elmore, the witness with whom Hodges had the engagement to attend a Masonic Lodge, said that Hodges had taken the two first degrees and he was preparing

him for the third. He was asked: "Do you know who lectured him in his degree work?" and objection was overruled. Again we conclude that while irrelevant there was nothing to make the question and answer "I did" incompetent or prejudicial. It is contended that Mr. Ropke, who is said in brief to be a Mason, took over the examination of Elmore, but no objection was made on this ground. Most all the above objections appear for the first time in appellant's brief.

The next and final objection, in brief alone, appears to be the testimony relative to the statements made to Hogg and Blades. A survey of the testimony of the witnesses fails to show objection to their testimony as a whole, or to any questions asked them, except in one immaterial instance.

As is customary in cases where the extreme penalty is inflicted, we have given this case the closest scrutiny. While there is no criticism of instruction we have examined and find them to be correct on every phase of the case. The court was careful to give an instruction on Nease's contention that he had been forced to participate in the holdup and all that followed, by duress on the part of Workman. The Court instructed the jury to the effect that if they believe him they should find him not guilty. The Court admonished the jury as to the effect and weight to be given the testimony of the officers. It follows that finding no prejudicial error in the record we are compelled to affirm the judgment.

Judgment affirmed.