## McPeak v. Commonwealth.

June 1, 1948.
Rehearing denied October 1, 1948.

John T. Fowler for appellant.

A. E. Funk, Attorney General, W. Owen Keller, Assistant Attorney General, Frank A. Ropke, Commonwealth's Attorney, Carl C. Ousley, Jr., and William M. Harvin, Assistant Commonwealth's Attorneys for appellee.

OPINION OF THE COURT BY VAN SANT, COMMISSIONER —Affirming.

This is an appeal by the secondly convicted member of a trio, all of whom, on separate trials before different juries, were found guilty and sentenced to death for the offense denounced by KRS 433.140, by robbing Vernon Hodges with the use of a deadly weapon. Jasper Nease and Herbert Workman were appellant's accomplices. Nease was convicted first, and the opinion affirming the judgment in that case was rendered by this Court on April 23, 1948, and is reported in 307 Ky. 640, 211 S. W. 2d 826. Since the evidence for the Commonwealth in this case, except as to the letters hereinafter referred to, is identical with that of the Commonwealth in Nease v. Commonwealth, supra, even to the confessions of Nease and McPeak, we will not iterate those facts, but will refer the reader to that opinion.

Appellant took the stand in his own behalf; and admitted all the facts introduced by the Commonwealth, except that he contended that he did not participate in the crime, but was forced to accompany his accomplices

through fear of death at their hands. He admitted, however, that he knew Nease and Workman to be desperate characters; but despite this fact, while all three were military prisoners at Fort Knox, he helped them overpower a guard from whom they secured an Army carbine, which is the deadly weapon alleged and proved to have been the one used in the commission of the crime. He further admitted that when they escaped imprisonment at Fort Knox, he knew it was the intention of his accomplices to steal an automobile. He testified that, after they had walked for some distance, they obtained a ride with Prentice Knopf, who let them out at the intersection of Old Third Street Road and the New Cut Road in Jefferson County; that shortly thereafter Nease and Workman obtained a ride with Vernon Hodges, the victim of this atrocious crime. He testified that he did not enter the Hodges car at that time, ''because I knowed they (Nease and Workman) was going to get into some kind of trouble sooner or later.'' He stated that about twenty minutes later the Hodges car returned; Nease was driving and ''Workman was sitting in the back seat with the carbine on Hodges, in Hodges' back, and Hodges had his hands up.'' He then related that he was compelled by Nease and Workman to get in the car. That between Louisville and Frankfort Nease exchanged clothes with Hodges and took $20 in cash and a $12 check from Hodges. They stopped at a filling station near Frankfort and filled the gasoline tank of the automobile, bought three beers, one for appellant, one for Hodges, and one for Workman, and Nease drank one beer inside ''the joint.'' After they drove through Frankfort, Nease stopped the car on the side of the road, took the gun from Workman, and directed appellant to tie Hodges' hands, which, under compulsion, he did. Workman then tied handkerchiefs around Hodges' mouth and eyes, thereupon they placed Hodges in the back seat. He then related that they drove to or near Hazard on Highway No. 7, where they forced Hodges to get out of the car; there they fastened a rock to Hodges' body; and, at Nease's direction, Workman pushed him into the Kentucky River. Thereupon Hodges freed his hands and removed the handkerchief from his face; but Workman tore a piece from his shirt and gagged Hodges with it. Appellant testified that he immediately left the scene

and returned to the road; started toward Hazard to report the crime; and on his way thumbed a car which happened to be occupied by Nease and Workman. He stated that then he was threatened by both Nease and Workman if he reported the crime to the police. That afterward they went to the home of Nease's aunt, where they obtained something to eat and refilled the car with gasoline. They then went to the home of Nease's mother and father, who were absent. This was early on the morning of Friday, March 14, 1947. Nease instructed Workman and appellant to remain at his father's house while he endeavored to find his mother and father. Nease returned after dark on Friday night after his mother and father had returned to the house. On Saturday morning Nease's father drove to the town of Neon, purchased a can of black paint which he gave to Nease, and the three then caught a bus and went to the home of Nease's sister, where the car was parked, at which place Nease and Workman painted the fenders of the car. Nease called on his "girl" that night, and appellant stayed at the home of Nease's parents until Tuesday morning, when he hitchhiked a ride to his home in Virginia. Appellant thereafter was arrested in Virginia, and confessed his participation in the crime. While he was confined in jail he and his accomplice Workman exchanged letters, of which appellant was the author of three. The letters from Workman to him were not introduced in evidence, but the letters from McPeak were. These letters, with their implications, conclusively show appellant to have been one of the principal participants in the crime of which he was convicted. Some of the language contained in the letters is so obscene as to impel us not to publish them in full. Deleted of the obscene language, the letters read as follows:

### First Letter

"In answer to your letter—now, this is what I want you to say and nothing else but this, for I have made my statement and if I change it, it will look bad for you and me. So this is what I want you to say. My statement: Fort Knox, I hold the guard and Jasper grabbed the gun and you got the belts and Jasper tied him up, and we stayed in the field until dark and walked all night. The next day we came to a farm house and some man gave us fifty cents and we got the bread and dough-

nuts, and we went on walk all day. About 5:30 we got the first car and went to the forks and Jasper said it was a 'coupe car that you and he would leave me, that we was going * * * that I didn't know that you was going to take that one. That you and Jasper left me to get another ride home. In about twenty minutes later that you and Jasper came back to me with this car and Jasper said, 'get in' and I said 'no,' that I would get another ride. But he made me get in. He said that he was afraid that I would tell on him, and Hodge showed Jasper the way and the route; and somewhere on the road Jasper changed clothes with Hodge and bought some beer and gas. And next to Hazard he stopped and told you to give him the gun. And he got out of the car and put the gun on Hodge and told me to tie him up, and I said 'no,' and he put the gun on me and said, 'make it fast.' So I had to tie him and I didn't have anything to do with the rest. And I was the first one back to the car and you next, and Jasper last. But tell them Jasper did make you go in the water but you did not hit Hodge and you and he painted the car and the rest of your statement is like mine. And I will remember it. So, that's all pal, you don't tell them that we sleep on the way. So, that's all pal and the best of luck to you and write me often. So long."

## Second Letter

"Well, pal, it looks like that Jasper might get enough money to * * * you and me up. But he can't me so bad, but you have not got a lawyer, and he can * * * you good. So it looks like that I will have to work hard for you so the best thing we can do is for you to tell them when you make your statement that Jasper done all the talking and you done all the work, and you and he made me get in the car and when Hodge was tied up that Jasper had the gun on me and Hodge and you helped me to tie him up. And that was all that I had to do with it. So pal, it is best if you tell this. You know that you said at his house and his mother and dad and the rest heard it, that you did the most of it all. And if they get on the stand and say this, you are * * * and Jasper may get enough money to * * * you and get out of it himself. So you know that we don't want that. I think if anyone get out of it, it is me. How about that? And if you will promise me that you will do this,

and will, I will promise you the blades and I will go out with you. But I want them to know here that I had nothing to do with but what I was forced to do. And anything you say like this will be the same as my statement. So you answer right away and tell me if you will do this or not. So I can tell my brother to get the blades and put them in a shoe and send them to you, and I will pay you good for this. So pal, we can * * * him, but this is the only way. So long pal.''

### Third Letter

''Listen, you * * *, tell them that I thought you were backing Nease up, and I knowed you had the gun and told me to get in that he was not going to take any chances on me, so I got in. Do you get me now? And will tell them if I knowed then that you was not backing Jasper up that I would have not got in the car. But I didn't know and you can tell the rest the way you said. But if I get what I want I won't worry about these * * * trials. What I mean by make it good, that is to keep me out of it like we said, and if you broke out and I get out free I can hide you and keep you straight; now do you get me? I hope we can get out anyway so we can get some of that good * * * out there. So long, you * * * . Answer.''

Appellant assigns five grounds for reversal of the judgment: (1) ''The Court erred in the admission into the evidence of posed photographs of Vernon Hodges taken before the time of the alleged commission of the armed robbery''; (2) ''the Court erred in the admission of evidence of other offenses or crimes on the part of appellant''; (3) ''the Court erred in his instructions, in failing to instruct the jury on the crime of accessory after the fact''; (4) ''the Court permitted and allowed, over the objection of appellant's counsel, improper conduct on the part of the Commonwealth's Attorney''; and (5) ''the Court erred in refusing a new trial where the decision of the jury is obviously the result of passion and prejudice.'' We will discuss the contentions in the order named.

The article of which the Commonwealth contended Hodges was robbed was a cream colored Packard convertible coupe. Necessarily it was incumbent on the Commonwealth to prove that the property belonged to a

person other than the appellant or his accomplices. The Commonwealth could not anticipate with reasonable assurance that the defense would not claim the automobile belonged to appellant or one of his accomplices; that being true, it was competent for the Commonwealth to introduce the photograph of the real owner of the automobile, to show the jury that the owner was not the defendant on trial or either of his accomplices.

The basis of the second contention relied on for reversal is that the Commonwealth introduced evidence that appellant and his accomplices, following the robbery, committed the additional crime of murdering their victim. The law is well settled that, in the prosecution of a defendant for one crime, evidence of another crime may not be introduced. But there are exceptions to this rule, the most notable of which is applicable in this case; that is: Where several felonies are parts of the same transaction, evidence of all is admissible on the trial of an indictment for any one of them. Snapp v. Commonwealth, 82 Ky. 173, 6 Ky. Law Rep. 34; Keller v. Commonwealth, 230 Ky. 815, 20 S. W. 2d 998. The evidence likewise was competent in proof of motive and guilty knowledge, in that the jury reasonably could infer from the fact that the victim of the robbery was murdered that it was the intention of the perpetrators of the robbery to eliminate the only innocent eyewitness to the crime of which appellant was convicted.

The complaint in respect to the instructions is that the Court erred in failing to instruct on the crime of accessory after the fact. Counsel for appellant virtually admits in his brief that this contention is without merit, when he says:

"*Although we apparently have no justification for saying so,* it is the contention of the counsel for appellant that the defendant, McPeak, according to the evidence in this case was entitled to an instruction on accessory after the fact." (Our emphasis)

The basis of the contention is that appellant did not enter the automobile of Mr. Hodges until approximately twenty minutes after his accomplices had done so, and that the crime had been committed in full by his accomplices before he participated in any unlawful act. But the robbery in this case was one of consecutive con-

tinuous acts, commencing, if appellant's testimony be taken as true, twenty minutes before he became a participant, but continuing throughout and culminating at the time of the taking of the life of the owner of the automobile. That being true, appellant was either a principal or no participant at all; therefore, he was not entitled to an instruction on accessory after the fact.

The alleged improper conduct on the part of the Commonwealth's Attorney, which is the basis of the fourth contention that the judgment should be reversed, is: (a) The closing argument of the attorney for the Commonwealth "dealt with murder and mentioned armed robbery as only a side light;" and (b) he "made remarks to the jury which led the jury to believe that unless they returned a verdict of guilty and a death sentence that they would not have done their duty as jurors in this case." The argument complained of is short; and since the penalty is the most severe that can be meted, we will quote it at length:

By Mr. Ousley, Assistant Commonwealth's Attorney:

"May it please the Court, Mr. Fowler, and gentlemen of the jury, I briefly want to recall to your minds the evidence that the Commonwealth has presented from this stand today. We have shown you that this defendant and his co-defendants escaped from Fort Knox, got in one car in this County, were let out on the Old Third Street Road; that they stopped this boy, Vernon Hodges, with this rifle, and Mr. Fowler says this is uncontradicted, McPeak never touched this gun; but there was only one gun when the other boys brought Hodges back, and the first thing this man did was to search him to see if he had a weapon. There is no evidence that this man stole the car, says Mr. Fowler. Well, when was the car stolen? They took it from here to Hazard, Kentucky, some two hundred miles; they kept it four or five days or a week, and then in order to conceal that crime that was committed here, in addition to taking the check and the twenty dollars and the very clothes the man had on his back, in order to hide that they took him down to Perry County—you are not trying him for murder, but to conceal the crime they committed here, armed robbery, he and his co-defendants took this man down

to the Kentucky River in Perry County and threw him
in the river with this rock around him. My God, gentle-
men, have you ever heard in this Court Room or in any
other Court Room in the United States or in the State
where there has been presented any such crime as we
have presented to you. There is nothing more the Com-
monwealth could do; we don't have a motion picture
machine or a dictaphone to take everything down; we
brought you witnesses and those witnesses told you
facts. There is no reason why Sergeant Hogg, of the
United States Army, and Captain Blaydes, a Common-
wealth Detective, would come here and lie; they don't
know this boy and they have nothing against this boy.
No, gentlemen, you have heard enough of the facts,
there can be no doubt in your mind about this man's
guilt. What does the defendant say? Let me remind
you briefly; he said he knew that Workman and Nease
were going to get into trouble, but he went along with
them. He admitted that Hodges had his hands in the
air when he got in the automobile. Of course, he admit-
ted he had his hands in the air; probably begging for
mercy at the time, but McPeak says Nease and Workman
forced me to do it, they forced me to get into the car;
he didn't say they forced him to overpower the guard
at Fort Knox, but they forced him to get into the car,
forced him to ride in that automobile for two hundred
miles—I suppose that took five or six hours anyway—
forced him, as he admitted, to tie this boy up, and forced
him to throw him in the river; then he was forced to
stand on that corner twenty minutes, if that is what
happened, waiting for them out there. Let me tell you
this, and get this, gentlemen—I know what I am talking
about; today is the first time since your detective and
Commonwealth's Attorney have questioned this defend-
ant, and we questioned him many times, this is the first
time coercion was ever mentioned; it is purely an after-
thought. Of course, each one is blaming it on the other,
naturally trying to save their own skins; put them all in a
bag and pull one out and they are all the same. Of
course, he is going to say the other fellow did it; then,
these letters—these letters that this man wrote to Work-
man show the cunning and criminal mind, in my opin-
ion of this man—you say this over there, referring to
the Court House, Criminal Court—you say this, 'and I

will walk out and I will send you the blades and you can get out.' No, there can be doubt, gentlemen, about this man's guilt; I have no fear of that, and I haven't a great deal of fear about the punishment. I know it is a tremendous responsibility upon you jurors to write the death penalty; it is a terrible responsibility upon you jurors to write the death penalty; it is a terrible responsibility upon your Commonwealth's Attorney to recommend it. I too didn't sleep very well last night, and I too said some prayers last night and Sunday at Mass that I would be given power to do my duty in this case, and I think I can sleep tonight after I sit down. Did this boy show any mercy to Vernon Hodges? If any of you waver back there in the jury room take this picture with you of that twenty-six year old boy now dead in the cemetery. Did he give him the right to see the only mother that he ever knew before he died, Mrs. Arnold, his sister? Did he give him a right to see the only father he ever knew, Mr. Steedly? No, he did not. Did he give him a right to make an act of contrition before he was thrown into the river? There is no reason in God's world to show this man any mercy, and if anybody gets back in the jury room and talks about life imprisonment I want to say this to you—you were qualified as carefully as your Commonwealth's Attorney knew how this morning, and you said if warranted by the evidence you would inflict the death penalty, so if there is any man that thinks about giving this man life imprisonment there will be one or two of you gentlemen I know who will stick with your Commonwealth's Attorney and hang the jury and we will get a jury that will try this man and give him what he deserves. And gentlemen, let me remind you of something—something was said that this man is not being tried for murder; he is not. Something was said about passing the buck, so to speak, to Perry County. Let me tell you this, gentlemen, and I know what I am talking about, if justice is to be done in this case it must be done in this Court Room and in this County tonight.

"Mr. Fowler: I object to that.

"The Court: We are trying the case on the law and the evidence we have heard here.

"Mr. Ousley: I repeat, if justice is to be done it

must be done in this County and in this Court Room to-night, and every one will have done their duty, gentle-men, in this case. In fairness to what has gone before and in fairness to those that have received the supreme penalty in this Court Room or any other Court Room death must be written in this case; there can be no other verdict. If you don't give this man the electric chair then tear up your Constitution and wire your Governor to break up the electric chair. There is a great responsibility off my shoulders, Judge Mix has done his duty, he has instructed you in the law, it is up to you gentlemen, and I pray God that you will do your duty and give this man death in this case today."

We often have condemned arguments of prosecut-ing attorneys which are calculated to arouse the passions and prejudices of juries; but where the evidence itself is so inflammatory as to render any argument in respect to it of little importance, the argument itself can not be deemed to constitute error of a prejudicial nature. 23 C. J. S., Criminal Law, sec. 1105, page 579; Carter v. Commonwealth, 278 Ky. 14, 128 S. W. 2d 214. We know of no case wherein the evidence is more inflammatory than in this; and whilst some may not be in sympathy with the infliction of the death penalty in any case, there can be no doubt that, if it is just at all, it should be inflicted in this instance.

What we have said disposes of the fifth ground urged for reversal.

The judgment is affirmed.