James Earl SLAUGHTER a/k/a James
Earl Slawter, Appellant,

v.

COMMONWEALTH of
Kentucky, Appellee.

No. 84–SC–272–MR.

Supreme Court of Kentucky.

Nov. 5, 1987.

Rehearing Denied March 3, 1988.

JoAnne M. Yanish, Rodney McDaniel, Asst. Public Advocates, Frankfort, for appellant.

David L. Armstrong, Atty. Gen., Frankfort, Mary-James Young, Virgil W. Webb, III, Asst. Attys. Gen., Frankfort, for appellee.

STEPHENS, Chief Justice.

James Earl Slaughter was convicted in the Jefferson Circuit Court of first-degree robbery and murder. He received a sentence of 20 years for robbery and was sentenced to death for the murder. This matter of right appeal results. We affirm.

The charges underlying the convictions arose from the death of a store owner, Esther H. Stewart, in Jefferson County on January 28, 1983. Following an investigation, Slaughter was arrested on the day after the crime. He voluntarily gave a statement to the police in which he claimed to have been acting as a "lookout" when another man, known only to appellant as "Red," killed Stewart. Slaughter, who is black, told police that he had picked up a white, male hitchhiker ("Red") and agreed to help him rob a local store.

In preparation for the robbery, the two men supposedly exchanged clothes and shoes. Slaughter stated he loaned his gun to "Red" because the small knife "Red" carried was inadequate. According to his statement, Slaughter waited outside the store. He heard a scream, "Red" ran out of the store and the two men ran from the scene. After re-exchanging clothes, appellant drove "Red" to a local arcade and never saw him again.

The police investigators at the scene discovered a single, undischarged bullet on the floor near the victim. This bullet was later matched with the appellant's gun. The cash register was opened with difficulty, and the victim's wallet was sticking out of her purse. Police detectives questioned the owner and patrons of the arcade but were unable to locate or identify the man called "Red."

Trial began on October 24, 1983. Commonwealth witnesses testified to seeing a man run from the store. This man was identified alternatively as a white man, a black man, or by his clothes, a blue jacket and blue pants. Slaughter's housemates testified that on the night of the robbery, he was wearing a blue jacket and pants. His clothes were discovered the next morning and were stained with blood. Slaughter had left the apartment carrying his gun. A butcher knife, not used in preparing the evening meal, was found in the dish rack in the morning.

At least three witnesses heard and repeated Slaughter's admission to his involvement in the crime. Their version was that Slaughter related that his intention was to rob the store. When he asked the woman for money she screamed. He hit her with his gun and then stabbed her to stop the screaming.

The doctor who performed the autopsy stated the victim's death was due to a stab wound. Other injuries included multiple stab wounds and a blow to the head.

The jury found Slaughter guilty of murder and robbery during the guilt phase of the trial. During the penalty phase the jury recommended death due to the aggravating circumstance of the murder having been committed during the course of a robbery.

The facts will be discussed in more detail as specific issues are reviewed. Appellant raised 29 issues on appeal. Although we have carefully considered all of them, only certain ones will be discussed in this opinion. All others are without merit.

With respect to the guilt phase of the trial, we will consider the following contentions of appellant: (1) whether there was sufficient independent corroborative evidence (other than evidence of appellant's confessions) presented to sustain the conviction of robbery; (2) whether the trial judge committed reversible error in failing to excuse for cause a prospective juror who may have doubted her own partiality; (3) whether the closing argument of the prosecutor constituted reversible error; and (4) whether the trial court erred in failing to instruct the

jury on wanton murder and second degree manslaughter.

With respect to the sentencing phase of the trial, we will consider four issues: (1) whether reversible error was committed by the trial court's permitting a juror to question the appellant; (2) whether the trial court erred in failing to make a finding whether the evidence was sufficient to foreclose all doubt of guilt; (3) whether certain conduct of the prosecutor was of such a nature as to deprive appellant of a fair trial; and (4) whether appellant's sentence of death is disproportionate to other recent Kentucky death penalty cases.

## WAS THERE SUFFICIENT CORROBORATIVE EVIDENCE, OTHER THAN THE EVIDENCE OF APPELLANT'S CONFESSIONS, TO SUSTAIN THE CONVICTION OF ROBBERY?

The basis of this argument is RCr 9.60, which is as follows:

"Corroboration of confession.—A confession of a defendant, unless made in open court, will not warrant a conviction unless accompanied by other proof that such offense was committed."

■ The corroborative evidence required addresses itself as to whether the *crime* charged was committed and *not as to whether* the particular defendant committed it. *Taylor v. Commonwealth*, Ky., 461 S.W.2d 920 (1970), cert. denied, *Brown v. Kentucky*, 404 U.S. 837, 92 S.Ct. 126, 30 L.Ed.2d 70 (1971); *Wilson v. Commonwealth*, Ky., 476 S.W.2d 622 (1971). Such proof, very simply, must be independent of any out-of-court confession, and must show that the charged crime was, in fact, committed. Once such evidence is present, guilt of the defendant may be proven by the evidence of the confession(s). *Dolan v. Commonwealth*, Ky., 468 S.W.2d 277 (1971). The rule, in its effect, requires that the *corpus delecti* of the crime be proven by independent, corroborative evidence.

Thus, we examine the record to see if there is, in fact, evidence other than the out-of-court admissions of appellant that first-degree robbery was actually committed. This question (and its answer) takes

on special significance in that the commission of the murder during the course of the robbery was the only aggravating circumstance that would have justified the imposition of the death penalty. KRS 532.025(2)(a)2. If there was no compliance with the mandate of RCr 9.60, the death sentence, in this case, would have to be reversed.

■ Specifically, therefore, we determine if the independent evidence in the record shows that the statutory elements of robbery in the first degree are present. That crime is defined in KRS 515.020:

"(1) A person is guilty of robbery in the first degree when, in the course of committing theft, he uses or threatens the immediate use of physical force upon another person with intent to accomplish the theft and when he:

"(a) Causes physical injury to any person who is not a participant in the crime; or

"(b) Is armed with a deadly weapon; or

"(c) Uses or threatens the immediate use of a dangerous instrument upon any person who is not a participant in the crime."

The two basic elements necessary to prove this crime are the *intent to commit a theft* and either the causing of a physical injury, the presence of a deadly weapon or the threat of use of a dangerous instrument. It is crystal clear, and is not contested by appellant, that the owner and operator of the store was killed by various blows and by multiple stab wounds. The medical examiner's testimony, plus others', prove that element of the crime.

Appellant concentrates his argument on the purported lack of evidence to sustain the other element of the crime, *viz,* whether there was independent evidence to show an intent to commit a theft. We believe that there is an abundance of evidence to show that James Earl Slaughter had the requisite intent to commit theft. A witness testified that Slaughter had been in the store several days before the crime and was loitering and acting suspiciously. He was, in effect, "casing" the store. It was

also shown that the cash register in the store was open, slightly, when an investigating officer entered the store and took a photograph of it. Also, it was testified to that the same cash register was broken. The clear implication is that the cash register was attempted to be opened by the killer, and in so doing, it was broken. A drawer, under the cabinet on which the cash register was located was wide open when the police came into the store. It is reasonable to assume that the killer was rummaging about near the cash register, looking for money.

Also, the decedent's purse was empty of money when police found it behind the drawer underneath the cabinet holding the cash register. The purse, moreover, was open, and the wallet inside the purse was partially out of the purse. This is further indication that the killer was searching for money.

The killer of Mrs. Stewart was in the store, armed with a gun and a knife. The purpose of such presence was clearly to rob her. His previous scouting of the store, the attempt to open the cash register, the opening of the drawer, and the opening of the purse clearly are evidence of such nature as to show a clear intent to commit a theft. A jury would be totally justified in so believing. *Trowel v. Commonwealth*, Ky., 550 S.W.2d 530 (1977). In *Bailey v. Commonwealth*, Ky., 502 S.W.2d 48 (1974), we held that the fact that the victim had a wallet on his person during the day he was shot, and that it was missing when his body was discovered, was sufficient independent evidence to corroborate a confession of armed assault with intent to rob. The evidence present here is stronger than that present in *Bailey*, and we find that RCr 9.60 was complied with.

■ We, therefore, decline to dismiss the robbery charge and, *a fortiori*, to reverse the imposition of the death penalty for this reason.

### DID THE TRIAL JUDGE COMMIT REVERSIBLE ERROR IN FAILING TO DISCHARGE, FOR CAUSE, JUROR GRAF?

■ During individual voir dire concerning juror attitudes about the death penalty,

Graf volunteered the information that she had previously been a victim of a break-in at her home. She asked, "Does this have to do with a break-in type robbery?" When the court asked her to elaborate, she stated, "My home was robbed twice and I saw the party and I don't think I could be very impartial in . . . ." The prosecutor explained that this was the robbery of a store, and Graf stated that she " . . . probably wouldn't have any . . . ." Before she could finish her answer, appellant's counsel interrupted her. She then stated:

"I was frightened so badly because I found them in my home and I just . . . I just would't want to be involved with anything like that. *But this break-in, I could make that general and I probably could be impartial.*" (Emphasis added.)

The trial court reserved his ruling on a challenge for cause, and specifically invited defense counsel to inquire further. He failed to do so.

In determining whether a juror should have been stricken for cause, we have declared that such determination lies within the sound discretion of the trial judge, and his ruling will not be disturbed unless his action was clearly erroneous. *Caldwell v. Commonwealth*, Ky., 634 S.W.2d 405, 407 (1982). It is clear that the trial court felt that Graf could be fair and impartial, and in fact, had been "rehabilitated" by her subsequent questions and answers in individual voir dire. Clearly there is no abuse of discretion here.

### DID THE CLOSING ARGUMENT OF THE PROSECUTOR CONSTITUTE REVERSIBLE ERROR?

■ In any consideration of alleged prosecutorial misconduct, particularly, as here, when the conduct occurred during closing argument, we must determine whether the conduct was of such an "egregious" nature as to deny the accused his constitutional right of due process of law. *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). The required analysis, by an appellate court, must focus on

the overall fairness of the trial, and not the culpability of the prosecutor. *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

◼ In his final summation, the prosecutor noted that what defense counsel said is not evidence in the case. He criticized the defense counsel for presenting a "great octopus" defense. He accused counsel of pulling a "scam," and he questioned the sharpness of counsel. Great leeway is allowed to *both* counsel in a closing argument. It is just that—*an argument.* A prosecutor may comment on tactics, may comment on evidence, and may comment as to the falsity of a defense position. We find that the remarks referred to here were well within the proper bounds of a closing argument and certainly did not affect the outcome of the trial. See *Hunt v. Commonwealth*, Ky., 466 S.W.2d 957 (1971); *Houston v. Commonwealth*, Ky.App., 641 S.W.2d 42 (1982); and *Johnson v. Commonwealth*, Ky., 302 S.W.2d 585 (1957).

◼ Appellant urges that the prosecutor coerced the jury to reach a verdict of guilty. He stated to the jury that he had done all he could do, that the police had done all they could do, that the judge had been fair and impartial, and "... now it's going to come your time to deal with justice in this particular case." This argument of appellant is little short of being specious. A prosecutor can ask the jury not to "let the officer down." *Johnson v. Commonwealth*, Ky., 446 S.W.2d 561 (1969). A prosecutor may call on the jury to do its duty. *McPeak v. Commonwealth*, 308 Ky. 29, 213 S.W.2d 447 (1948). A prosecutor may tell a jury that one way to stop murder is "for all of us to do our job...." *Wallen v. Commonwealth*, Ky., 657 S.W.2d 232 (1983). Under the parameters of these cases, it is obvious that the statement was proper.

◼ Appellant also complains that the prosecutor expressed his personal opinion of the defendant's guilt. Such comment is admissible as long as that opinion is based on evidence in the case. *Koonce v. Commonwealth*, Ky., 452 S.W.2d 822 (1970).

◼ Lastly, complaint is made that the prosecutor made reference to defendant as a "bit of evil." We have held it permissible to refer to a defendant as a "beast," *Koonce, supra,* and as a "desperado," *Holbrook v. Commonwealth*, 249 Ky. 795, 61 S.W.2d 644 (1933). It has also been held proper to describe a particular defendant as being worse than all the convicts and traitors in hell. *Cook v. Bordenkircher*, 602 F.2d 117 (6th Cir.1979). A "bit of evil" is certainly less offensive than the sobriquets applied in those cases.

We find no error in any of the arguments made by the prosecutor in his closing argument.

## DID THE TRIAL COURT ERR WHEN IT FAILED TO INSTRUCT THE JURY ON WANTON MURDER AND SECOND DEGREE MANSLAUGHTER?

◼ Appellant contends that he was entitled to an instruction on second-degree manslaughter. KRS 507.040 provides:

Manslaughter in the second degree.—(1) A person is guilty of manslaughter in the second degree when, including, but not limited to, the operation of a motor vehicle, he wantonly causes the death of another person.

Further, "wanton" has been defined as: "Wantonly"—A person acts wantonly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts wantonly with respect thereto.

Appellant maintains that an instruction on wanton murder was mandated based upon his alleged participation in the robbery as a look-out, during which the victim was murdered.

We disagree. The jury must be instructed according to the evidence. *Sanders v. Commonwealth*, Ky., 685 S.W.2d 557 (1985). In the case at bar, there was no evidence of intent whatsoever. Indeed, appellant argued at trial that an unidentified other man actually committed the robbery-murder. The jury was unconvinced. We have consistently held that when the evidence is such that a reasonable jury could convict the defendant of a lesser offense, an instruction on that offense is necessary. *Smith v. Commonwealth*, Ky., 737 S.W.2d 683 (1987), *Commonwealth v. Rose*, Ky., 725 S.W.2d 588 (1987), *Baker v. Commonwealth*, Ky., 677 S.W.2d 876 (1984). However, an instruction on wanton murder was not appropriate here, because there was no evidence of intent presented whatsoever, and no reasonable jury could conclude that appellant consciously disregarded an unjustifiable risk he denied ever taking.

## WAS IT REVERSIBLE ERROR FOR THE TRIAL COURT TO PERMIT A JUROR TO QUESTION THE DEFENDANT?

Whereas appellant did not take the witness stand during the guilt phase of the trial, he did so during the penalty phase. Following his direct examination, a juror questioned him as follows:

"Juror No. 5: I have a question. He stated that he knew, he and this Red had been friends for sometime. Where did this Red live [?] He would had to visit or something. Where did this Red live? Where did he hangout at? Why didn't any of your friends know about you and Red and since you . . .

"The Court: That is about five questions there. I'll allow the questions. But there was about four there.

"Witness [Appellant]: Um, I would say this much. He stays on Hill Street. I won't say what part or what but he stays on Hill Street.

"Juror No. 5: You are asking for your life and nobody can find Red and you refuse. Why do you refuse to tell his address so he can be found to save you probably?

"Witness: I . . .

"Mr. Radolovich: May we approach the bench."

Appellant argues that the questions of the juror show a predisposition against him. He argues that the trial court should have screened the questions prior to permitting them to be asked. He argues that the last question "inflamed" the jury.

In addressing this issue, we are mindful of the fact that appellant did not testify at the guilt phase, and we are mindful that the jury found him *guilty* of robbery and murder. The challenged questions occurred during the sentencing phase of the trial.

■ It is proper for jurors to ask questions of witnesses so long as they are pertinent and competent. *Miller v. Commonwealth*, 188 Ky. 435, 222 S.W. 96 (1920). The rationale is that questions (and answers thereto) are encouraged in the interest of justice and to enhance the understanding of the facts and issues in a case. In *Smith v. Commonwealth*, 140 Ky. 599, 131 S.W. 499 (1910), a juror was permitted to ask a defendant why he was carrying a pistol at the time he shot and killed the victim. We said that the questions,

"were both pertinent and proper for the purpose of developing and showing that in carrying the pistol . . . [the defendant] did so with the expectation that he might and would meet the deceased, and, if he did, shoot him." *Id.* at 501.

■ What was the purpose of the question? Certainly it was to determine if "Red" really existed, or if he was only a phantom created by appellant to absolve him of the crime. It is a question that probably would have been extensively discussed in the jury room. It is a legitimate question. A prosecutor may properly comment on the defendant's failure to introduce witnesses on a defensive matter. *Francis v. Commonwealth*, 311 Ky. 318, 224 S.W.2d 163 (1949). The gravamen of the question is the credibility of the witness. We find no error here.

■ Appellant also points out that Kentucky has no procedure for questioning by

a juror, *e.g.,* some courts require questions to be submitted in writing. We believe that any such procedure is not required. The jury—of all people—has the right to have questions—proper questions—answered. Such can only further their duty, their purpose, their *raison d'etre,* to search out the truth. We believe that the presiding judge can protect the rights of all parties by simply ruling on the competency of the questions, in the identical manner that he does in the course of the trial.

## DID THE TRIAL COURT ERR IN FAILING TO MAKE A FINDING THAT THE EVIDENCE WAS SUFFICIENT TO FORECLOSE ALL DOUBT OF GUILT?

██ KRS 532.075(1) provides that whenever the death penalty is imposed for a capital offense, the trial judge must prepare a report "in the form of a standard questionnaire prepared and supplied by the Supreme Court." Question 11 on the standard questionnaire prepared and supplied by this Court requires the trial judge to answer the following question: "Although the evidence suffices to sustain the verdict, does it foreclose all doubt respecting the defendant's guilt?" The trial judge in the case at bar did not answer this question; he instead responded that it was an "inappropriate question."

Appellant urges that this failure is of such magnitude as to require a new penalty phase hearing and requests us to remand the case to the circuit court for such a procedure. We decline to do so.

The purpose of the statutory mandate of this procedure and filing of the written report is set out in the statute. KRS 532.-075(3) is as follows:

"(a) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and

"(b) Whether the evidence supports the jury's or judge's finding of statutory aggravating circumstances as enumerated in KRS 532.025(2), and

"(c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

No specific questions are set out in the statute, that is left up to this Court. Certainly, the trial court should have answered *all* the questions. However, it is clear that he did answer all other questions and that those questions (and answers) provided all the information necessary to respond to the basic questions provided in the statute quoted above. At worst, this failure to answer the question was a technical error and in no way affected the judge's ability to impose the death penalty. Certainly, it does not affect our ability to thoroughly review the conviction.

## WAS THE CONDUCT OF THE PROSECUTOR OF SUCH A NATURE AS TO DEPRIVE APPELLANT OF A FAIR TRIAL?

The challenged conduct occurred during the cross-examination of the appellant and during the closing argument.

██ Appellant testified that he was nineteen years old at the time of the offense and twenty years old at the time of the trial. The trial court instructed the jury that it could consider the appellant's youth as a mitigating circumstance. KRS 532.025(2)(b)8; *Ice v. Commonwealth,* Ky., 667 S.W.2d 671, 680 (1984). In his closing argument, the prosecutor attempted to persuade the jury to reject appellant's youth as being in mitigation. He said:

"That James Earl Slaughter was a relatively young man at the time of the offense. Well, so he's twenty. I think one of the other witnesses who had been close to him had indicated something, *if my memory serves me correctly and if I am wrong, rely upon what you heard,* said something about the fact that the man indicated he was much older." (Emphasis added.)

Appellant argues that there was no evidence that he was "much older" and that such statement is a flagrant misrepresentation of the evidence and that it is highly prejudicial when the jury was considering

the appellant's youth as a mitigating factor.

Clearly, there was no attempt here to mislead the jury. The prosecutor, as shown above, carefully cautioned the jury that *his memory could be wrong*. He told them not to rely on him, but rather to rely on what *they* had heard. He also conceded that the appellant was "twenty." When the *entire statement is read,* no prejudice or misstatement is perceived.

■ At the penalty phase of the trial a psychologist testified that appellant had a borderline personality disorder with antisocial traits. He stated that people who have this disorder, as a group, have relatively poor prospects for improvement, but he declined to say that any single person, *e.g.,* the appellant, could not improve. In closing argument, the prosecutor seized on this testimony and quoted the psychologist as having said that appellant's prospect for rehabilitation was very, very poor. He said:

"Rehabilitation. I am not going to belabor or stay with that very long at all. Just take a look at the information which has been received by or from the psychologist, that under that circumstance the likelihood of rehabilitating this man is very, very poor."

Appellant argues that this argument was a flagrant misstatement of the evidence. We disagree. It is clearly a reasonable inference from the doctor's original statement, that as a *group,* the chances of improvement were very poor. The jury heard the testimony of the doctor, and regardless of the argument of counsel, (on either side of the case) they can determine the truth. There is no error here.

■ Appellant also objects to part of the prosecutor's closing argument in which he quotes the Bible. We have examined the argument and find that although it was improper, it was not prejudicial.

■ Finally, during his cross-examination of appellant, the prosecutor stated that appellant was "telling a lie now about not being the person who stabbed the lady to death." He ended his cross-examination by stating:

"This is the classic example of what you indicated to the psychologist; you tell these people any damn thing. I have no further questions of you."

It is argued that this expresses an improper personal opinion of the prosecutor.

Appellant, under cross-examination, had previously admitted to lying to the police about "Red" leaving a knife on the seat of the car. The comment, and that is precisely what it is, a comment, acknowledges a previous lie told by appellant. The comment of the prosecutor, a parting shot at appellant, was rhetoric, based on what the jury had already heard, *viz.,* that the appellant had admittedly lied once, and arguably, would lie again. We find no error or prejudice here.

## IS THE DEATH PENALTY IMPOSED AGAINST THE APPELLANT DISPROPORTIONATE?

■ We have carefully considered whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases and have in this regard considered the crimes committed here and all of the evidence surrounding Slaughter and his background.

The data for our use in this regard have been compiled in accordance with KRS 532.075(6)(a), (b), and (c). We have considered all of the cases in which the death penalty was imposed after January 1, 1970, as follows: *Scott v. Commonwealth,* Ky., 495 S.W.2d 800 (1972); *Leigh v. Commonwealth,* Ky., 481 S.W.2d 75 (1972); *Lenston and Scott v. Commonwealth,* Ky., 497 S.W.2d 561 (1973); *Call v. Commonwealth,* Ky., 482 S.W.2d 770 (1972); *Caldwell v. Commonwealth,* Ky., 503 S.W.2d 485 (1972); *Tinsley and Tinsley v. Commonwealth,* Ky., 495 S.W.2d 776 (1973); *Galbreath v. Commonwealth,* Ky., 492 S.W.2d 882 (1973); *Caine and McIntosh v. Commonwealth,* Ky., 491 S.W.2d 824 (1973); *Hudson v. Commonwealth,* Ky., 597 S.W.2d 610 (1980); *Meadows v. Commonwealth,* Ky., 550 S.W.2d 511 (1977); *Self v. Commonwealth,* Ky., 550 S.W.2d

509 (1977); *Boyd v. Commonwealth*, Ky., 550 S.W.2d 507 (1977); *Gall v. Commonwealth*, Ky., 607 S.W.2d 97 (1980), *McQueen v. Commonwealth*, Ky., 669 S.W.2d 519 (1984); *White v. Commonwealth*, Ky., 671 S.W.2d 241 (1984); *Harper v. Commonwealth*, Ky., 694 S.W.2d 665 (1985); *Skaggs v. Commonwealth*, Ky., 694 S.W.2d 672 (1985); *Kordenbrock v. Commonwealth*, Ky., 700 S.W.2d 384 (1985); *Bevins v. Commonwealth*, Ky., 712 S.W.2d 932 (1986); *Matthews v. Commonwealth*, Ky., 709 S.W.2d 414 (1986); *Marlowe v. Commonwealth*, Ky., 709 S.W.2d 424 (1986); *Halvorsen and Willoughby v. Commonwealth*, Ky., 730 S.W.2d 921 (1987); *Smith v. Commonwealth*, Ky., 737 S.W.2d 683 (1987).

The cases preceding *Gall* have had the death penalty set aside for the reason the statute was invalid under *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). In making a comparative study of these cases and the circumstances in this case, we are of the opinion the sentence of death here is not excessive or disproportionate to the penalty imposed in the enumerated cases.

The judgment is affirmed.

GANT, STEPHENSON and WINTERSHEIMER, JJ., concur.

LEIBSON, J., dissents in a separate opinion.

VANCE, J., dissents in a separate opinion in which LAMBERT, J., joins.

LEIBSON, Justice, dissenting.

Respectfully, I dissent.

I am concerned whether we have properly discharged our responsibility to perform an independent proportionality review as mandated by KRS 532.075, *Review of death sentence by Supreme Court*. It is our responsibility to decide "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." KRS 532.075(2)(c).

This proportionality review was statutorily mandated to comply with *Furman v.*

*Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) and *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Under more recent United States Supreme Court authority, *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), perhaps it is no longer a Federal constitutional requirement in every case, but nevertheless it remains a statutory obligation in every case.

I have reviewed the fact situation in *all* of the death penalty cases listed in the Majority Opinion. There is no case similar to this one where the death penalty was affirmed.

Here there is no evidence of premeditation. On the contrary the evidence proves that the appellant was attempting to rob a neighborhood store, and killed in reaction to the victim's panic and scream, whereupon he aborted the robbery attempt and ran out of the store. As stated in the Majority Opinion:

"... Slaughter related that his intention was to rob the store. When he asked the woman for money she screamed. He hit her with his gun and then stabbed her to stop the screaming."

The appellant was born February 3, 1963 and just turned 20 years of age when the offense occurred on January 28, 1983. The trial judge's report states the following mitigating circumstances were in evidence:

"No significant criminal history; youth of defendant; no history (of) conviction (of) violent offenses; did not flee; can be treated and rehabilitated; low intelligence; difficult childhood."

I am persuaded by the difference in this killing and *Stanford v. Commonwealth*, Ky., 734 S.W.2d 781 (1987). Stanford robbed, raped, sodomized and murdered Baerbel Poore, the clerk at a Checker gas station in Jefferson County. The critical difference was that Stanford knew the victim before the robbery and obviously intended to leave no witness. After committing robbery and sex offenses upon her, he forced the victim to drive with him some distance to a deserted area, kneel in the backseat, smoke a last cigarette, and he then killed her with a bullet through the

head, execution style. His past history showed that he had attempted a similar type of killing a short time before. If there is such a thing as two classes of murder that deserved different punishments, and the law as presently written presupposes that there is, then the line should be drawn somewhere between Stanford's case and Slaughter's case.

The structure mandated by the United States Supreme Court for deciding whether the death penalty violates Eighth Amendment protection against cruel and unusual punishments is twofold: (1) to determine whether the murderer is in the *death eligible class* and (2) then to decide if the murderer is *death qualified* by the circumstances *unique* to his case. By Kentucky statute those persons who murder in the course of a robbery are in the death eligible class. But the circumstances unique to this case do not justify the further decision that Slaughter's killing deserves the death penalty; at least not if we are trying to stop imposing the death penalty in an arbitrary manner.

Many death penalty cases have been reduced to life imprisonment on independent proportionality review by state Supreme Courts in Florida, Georgia and Texas, but none by ours. This is a case where independent review by our Court justifies a similar conclusion.

VANCE, Justice, dissenting.

I respectfully dissent. The appellant requested an instruction on second-degree manslaughter and objected to the failure of the court to give it. I believe he was entitled to such an instruction.

Esther Stewart died from a stab wound inflicted upon her during the course of the robbery. Appellant denied that he stabbed Mrs. Stewart but admitted to police investigators that he stood outside as a lookout while another man committed the robbery. Other witnesses testified that appellant admitted to them his involvement in the crime and stated that when he asked the woman for money she screamed, and he then hit her with his gun and stabbed her to stop her from screaming.

A detective testified that appellant stated that he was in the store when the robbery occurred but that nobody was supposed to get killed.

The appellant was convicted of intentional murder. Intentional murder requires a specific intent to cause death. K.R.S. 507.-020. A specific intent to cause death may be inferred from the circumstances, and the circumstances in this case were sufficient to warrant the jury to believe that appellant committed the robbery and stabbed Esther Stewart with an intent to kill her.

In view of appellant's statement that nobody was supposed to get killed and that he stabbed Mrs. Stewart to stop her from screaming, the jury might have believed that he stabbed Mrs. Stewart, but nevertheless have had a reasonable doubt as to whether or not he intended the stabbing to cause her death. If such a doubt existed in a juror's mind, but yet there was no doubt that appellant was aware of and consciously disregarded a substantial risk that death might result from the stabbing, he could reasonably have been found guilty of second-degree manslaughter by wantonly causing the death of another person.

Because the evidence was such that the jury could have had a reasonable doubt that appellant intended to kill Mrs. Stewart, yet not have doubted that he was aware of an unjustifiable risk that his act would cause the death of Mrs. Stewart, he was entitled to an instruction on second-degree manslaughter, a lesser included offense of the offense of murder.

LAMBERT, J., joins in this dissenting opinion.