# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

$\mathfrak{Supreme}$ $\mathfrak{Court}$ $\mathfrak{of}$ $\mathfrak{Kentucky}$ FINAL

2016-SC-000290-MR DATE 8/24/17 _Kim Redmon, DC_

DAVID ALBERT SOLOWAY                                   APPELLANT


                ON APPEAL FROM CAMPBELL CIRCUIT COURT
V.              HONORABLE JULIE REINHARDT WARD, JUDGE
                            NO. 15-CR-00469


COMMONWEALTH OF KENTUCKY                               APPELLEE


## MEMORANDUM OPINION OF THE COURT

## REVERSING AND REMANDING

A circuit court jury convicted David Soloway on two counts of first-degree sodomy, one count of sexual abuse, and first-degree persistent-felony offender (PFO), for which he was sentenced to forty-five years' imprisonment. He now appeals that judgment as a matter of right.[1] Because we hold that the prosecution's comment in its closing argument on Soloway's post-arrest silence constitutes a palpable error that substantially undermines the fairness of the trial, we reverse the judgment below and remand for further proceedings not inconsistent with this opinion.

---

[1] Ky. Const. § 110(2)(b).

# I. FACTUAL AND PROCEDURAL BACKGROUND.

In 2014, Amanda Lanthorne moved in with Soloway. She had three children—two sons and a daughter—who, at the time of trial, were thirteen, nine, and eight, respectively. At the time Lanthorne moved, her children were in foster care because of a domestic violence incident between Lanthorne and an ex-boyfriend. But within months, the children returned to Lanthorne's custody and joined her in Soloway's residence.

Soloway owned a three-bedroom residence. He shared a bedroom with Lanthorne, the boys shared a room, and Joyce[2] had her own room. Both Lanthorne and Soloway were employed and worked outside the home, so Soloway would take responsibility for the children while Lanthorne was at work. During these times, the two boys would often play video games with each other in their room while Soloway took Joyce to his room. As far as the boys were concerned, Joyce and Soloway were "napping" those times when Lanthorne was at work. But according to Joyce, Soloway molested her when they were alone in his bedroom.

Joyce was able to describe two instances of sodomy and one instance of sexual abuse. She claimed that she touched Soloway's private part while sitting on his bed. Recounting another incident, she said Soloway told her to lie on the bed with her legs hanging off. Soloway then got on his knees and proceeded to lick her vagina. Joyce claims he did this multiple times. And one final incident

---

[2] Joyce is a pseudonym.

occurred when Soloway put his private part in Joyce's mouth. Soloway instructed Joyce to never tell anyone about the things he did to her.

Though frightened by Soloway's warnings, Joyce eventually told her brother about what was happening. He told Lanthorne, who instructed him not to talk about it and that they would move from Soloway's residence. Lanthorne confirmed this account with Joyce, yet again instructed her to say nothing until Lanthorne figured out what to do. This led Lanthorne to contact Soloway's niece, Christina, who took Joyce to her home for the evening.

The next morning, Joyce's brother informed a teacher at school about the situation. This report caused the Cabinet for Families and Children and the police to become involved. When interviewed by the police, Lanthorne lied and omitted much of what Joyce had disclosed to her. And, despite being warned not to tip off Soloway, Lanthorne told Christina that Soloway was to be arrested, who then texted him "911." Soloway immediately fled to a motel and got drunk. But the next day, after coming to his senses, Soloway turned himself in.

The grand jury indicted Soloway on two counts of first-degree sodomy, three counts of first-degree sexual abuse and for being a first-degree PFO. A circuit court jury convicted him of two counts of first-degree sodomy, one count of first-degree sexual abuse, and of being a first-degree PFO. The trial court sentenced him to forty-five years' imprisonment and entered a conforming judgment. Soloway now appeals to this Court as a matter of right.

3

## II. ANALYSIS.

### A. The Commonwealth's Commentary On Soloway's Post-Arrest Silence During Closing Argument was Prosecutorial Misconduct.

Soloway draws our attention to the Commonwealth's statements related to his refusal to speak with law enforcement. His argument stems from two encounters. First, during his cross-examination, after confirming he instructed Christina not to speak with police and to invoke her Fifth Amendment right against self-incrimination, he volunteered that he would have spoken with the investigating detective had he been approached. The Commonwealth followed up this revelation with a line of questioning related to his silence and the detective's inability to question him because he had an attorney. Defense counsel never objected during cross-examination.

The second instance arises during the Commonwealth's closing argument when the prosecutor commented on this encounter. Specifically, Soloway takes issue with the following excerpt from the prosecutor's argument:

> [Soloway said] "[w]ell, they could have, they could have, they could have talked to me." And when [he]...got to the jail, "Yeah, they could have come talked to me." He had a lawyer. Detective can't talk to him.
>
> So he said he had a lawyer. And when I asked him if he tried to talk to law enforcement after he got his lawyer, what did he say? No, I did not. If you were an innocent man, if you think law enforcement can talk to you, would you talk to law enforcement? Even after you got a lawyer. Because you're not an innocent man. Ladies and gentleman of the jury, an innocent man, when he hears he's accused of child sex abuse, does he—what does he do? He tells everybody he knows. He goes to law enforcement and says, "I didn't do it. What do I need to do? Who do I need to talk to?" No, what did he do? What did he tell you? "I went to a motel and got drunk." Those are the actions of a guilty man that knows he should be going to jail.

4

Soloway's counsel objected, but only to state that it was unestablished that he had a lawyer at the time, and not to the line of questioning from the cross-examination. He argues on appeal that this portion of the closing argument was inappropriate and abusive conduct unbefitting a prosecuting attorney, rendering his trial fundamentally unfair.

When reviewing a question of prosecutorial misconduct, our relevant question on appeal is whether the defendant received a fundamentally fair trial.[3] Finding prosecutorial misconduct during closing argument requires proof that the conduct is flagrant, or a determination that each of the following is satisfied: (1) proof of the defendant's guilt is not overwhelming; (2) defense counsel objected; and (3) the trial court failed to cure the error with a sufficient admonishment to the jury.[4]

But we employ another, slightly different standard if defense counsel fails to timely object to alleged prosecutorial misconduct. After all, a party who desires an issue to be reviewed must make a timely objection during trial.[5] Failing to abide by this simple rule of evidence consequentially results in the issue being unpreserved for appellate review.[6] This failure to object removes the trial court's ability to admonish the jury to cure the potential error. In such

[3] *Maxie v. Commonwealth*, 82 S.W.3d 860, 866 (Ky. 2002).

[4] *Barnes v. Commonwealth*, 91 S.W.3d 564, 568 (Ky. 2002).

[5] *See West v. Commonwealth*, 780 S.W.2d 600, 602 (Ky. 1989).

[6] *See Bowers v. Commonwealth*, 555 S.W.2d 241, 243 (Ky. 1977).

event, we only reverse if misconduct is flagrant.[7] Flagrant misconduct requires evaluating the following four factors: (1) whether that remarks tended to mislead the jury or prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused.

In terms of Soloway's questioning on cross-examination, the Commonwealth correctly identifies that this line of questioning centered on his pre-arrest silence. And sure enough, this silence can be appropriately used by the prosecution in certain circumstances.[8] Though it may not be used to prove substantive guilt, the prosecution may use a defendant's pre-arrest silence for impeachment purposes.[9] The Commonwealth accordingly asserts that this line of questioning is used to undermine Soloway's alleged willingness to participate in the criminal investigation. And in this instance, we agree. Defense counsel did not object to this line of questioning, and we are persuaded that the prosecution only explored this issue after Soloway volunteered a willingness to talk to police before his arrest. So we see no error during cross-examination.

As for the Commonwealth's closing argument, that is a different story. We hold that these statements, despite the considerable leeway we allow for closing arguments, are inappropriate commentary on Soloway's assertion of his constitutional right to refrain from self-incrimination. To the extent the

---

[7] *Hannah v. Commonwealth*, 306 S.W.3d 509, 518 (Ky. 2010).

[8] *See Jenkins v. Anderson*, 447 U.S. 231, 239 (1980).

[9] *See id. See also Combs v. Coyle*, 205 F.3d 269, 283 (6th Cir. 2000).

6

Commonwealth merely commented on Soloway's own testimony on the stand relating to his pre-arrest silence, we find no error; the prosecution is certainly free to comment on testimony and the weight of the evidence.[10] But when the argument continued to equate his refusal, even after arrest, to speak to law enforcement, to behaviors inconsistent with those of an "innocent man," the Commonwealth flagrantly abused its authority in prosecuting the case. We consider an accused's right against self-incrimination sacred. And we take any assault on invocation of this right seriously. The prosecutor erred significantly in making these statements that misled the jury on the nature of Soloway's silence, and deeply prejudiced his defense. Despite Soloway failing to preserve this specific issue in the record, because this misconduct is flagrant and palpable, we have no choice other than to overturn the judgment below and remand for new trial.

As part of his appeal, Soloway raised a number of other issues. Because those claims are capable of repetition in the event of retrial, we now consider those issues in turn.

## B. The Trial Court Did Not Erroneously Allow Joyce to Testify Outside the Courtroom.

Soloway contends that the trial court abridged his right to confront witnesses guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Sections One, Two, and Eleven of the Kentucky Constitution, by allowing Joyce's testimony to be introduced by closed-circuit

---

[10] *See Mullins v. Commonwealth,* 350 S.W.3d 434, 439 (Ky. 2011).

television rather than live testimony in open court. The trial court issued the same ruling with respect to Joyce's brother's testimony as well. At trial, Soloway objected to the Commonwealth's motion to allow the closed-circuit testimony, which the trial court overruled.

The decision to allow testimony through closed-circuit television is governed by Kentucky Revised Statutes (KRS) 421.350. The statute applies only to criminal prosecutions when the alleged crime involves a child twelve years old or younger.[11] Upon motion by any party and after finding a "compelling need," the trial court may order the child's testimony be taken in another room and televised through closed-circuit television, with only the attorneys, people necessary to operate equipment, and those necessary to the child's welfare present.[12] The statute defines *compelling need* as a "substantial probability the child would be unable to reasonably communicate because of serious emotional distress produced by the defendant's presence."[13] And we have articulated that the proper standard of reviewing the trial court's determination is the abuse-of-discretion standard.[14] So we will not overrule the lower court's decision absent a finding that the ruling was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[15]

---

[11] KRS 421.350(1).

[12] KRS 421.350(2).

[13] KRS 421.350(5).

[14] *See Kurtz v. Commonwealth,* 172 S.W.3d 409, 411 (Ky. 2005).

[15] *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999).

8

In *Commonwealth v. Willis*, we outlined some non-exhaustive factors to aid trial courts in making this "compelling need" determination.[16] We said that "the age and demeanor of the child witness, the nature of the offense, and the likely impact of testimony in court or facing the defendant" are relevant considerations in determining compelling need.[17] At the time of the offense, Joyce was seven years old; she was only eight at the time of her testimony. The acts Soloway allegedly performed on Joyce were intensely personal. The trial court noted that after being informed of the number of other people that would be in the courtroom with her, Joyce bowed her head and reiterated that she did not want to see Soloway.

Soloway contends that this compelling need was not satisfied. He argues that Joyce's reluctance to testify is more related to the "stress" of testimony than any true mental anguish.[18] He further contends that his presence in the courtroom had no bearing on her actual testimony; he highlights her trepidation recounting the full account of her private interactions with Soloway with the child therapist in a non-courtroom setting. This, he articulates, shows that his presence, while perhaps upsetting Joyce, would not affect her actual testimony.

---

[16] 716 S.W.2d 224 (Ky. 1986).

[17] *Id.*

[18] *See George v. Commonwealth*, 885 S.W.2d 938, 941 (Ky. 1994) ("The Kentucky statute does not provide a blanket process for taking the testimony of every child witness by TV simply because testifying may be stressful.").

9

On its face, we cannot say the trial court committed reversible error. From all we can gather, ample evidence supports the finding a compelling need existed for Joyce to testify by closed-circuit television. We recognize that the United States Supreme Court has taken on a more robust interpretation of the Confrontation Clause in recent case law, holding that defendants enjoy expansive rights under the Sixth Amendment's protections. And no doubt that as this constitutional jurisprudence develops, statutes like KRS 421.350 will present more and more difficult decisions in cases of this kind. But for now, we are confident the trial court did not abuse its discretion in allowing Joyce to testify remotely.

Though we do not consider this reversible error, we must also stress the importance of following the statutory guidelines in the event of retrial. Years have passed since the original trial and, in turn, both Joyce and her brother have aged and matured during that time. The trial court should therefore evaluate each child separately to determine whether the need for closed-circuit testimony still exists and to make separate findings for each witness in accordance with the strictures of the statute.

## C. Other Instances of Prosecutorial Misconduct.

Soloway's final issue on review centers on various statements and actions that occurred during closing arguments. He contends that the Commonwealth's characterization of the events as "escalating" in intensity amounted to prosecutorial indiscretion. Because Joyce could not identify the order in which the acts took place, it was impossible to determine whether

10

Soloway's behavior escalated. And accordingly, the trial court ordered the prosecution to avoid characterizing his behavior in those terms. Additionally, Soloway also takes issue with the prosecution's emotional display during closing arguments.

His various additional claims of prosecutorial misconduct are preserved for review while others remain unpreserved. We will address each in turn.

### 1. The Commonwealth's characterization that Soloway's behavior was "escalating."

This first instance of alleged misconduct, and the one in which Soloway is most offended, remains unpreserved. The trial court did instruct the Commonwealth to avoid making statements characterizing Soloway's sexual acts as "escalating," but defense counsel failed to object to the Commonwealth's invocation of this phrase during closing arguments. So we will treat this issue as unpreserved, and we will only reverse upon finding that this alleged misconduct was flagrant.

It appears the use of "escalating" was an isolated incident in the closing statement. The record indicates that the Commonwealth only used the phrase once during the course of its argument. We are unpersuaded that the use of this phrase was part of some attempt to mislead the jury or mischaracterize the nature of Soloway's actions. And we agree with the Commonwealth that proof of Soloway's guilt was strong. The Commonwealth should have, of course, heeded the trial court's order to avoid labeling this conduct as escalating behavior, and the prosecution doubtlessly erred to do so anyway. But considering all of the factors before us, we cannot say this mistake was

11

reversible error as flagrant prosecutorial misconduct. So we agree with the trial court's ruling, though we caution the Commonwealth to heed the trial court's instructions regarding permissible statements in the event of retrial.

## 2. *The Commonwealth's display of emotion.*

Soloway also critiques the prosecutor's emotive actions during closing arguments as she recounted the acts Soloway was accused of committing. According to Soloway, the prosecutor became very emotional during her closing argument, crying when talking about the fact that [Joyce] was seven years old. Somewhat relatedly, he also takes issue with the prosecution's language in describing the acts underlying his criminal accusations. This issue was properly preserved for appeal.

In *Byrd v. Commonwealth*, we recognized that "Trials are conducted by humans, who often show indignation, anger or sadness. This does not mean that real emotion is misconduct."[19] Here the allegedly criminal acts giving rise to this case are undoubtedly tragic—a seven year old girl was molested and abused in a disturbing manner. We cannot say it is misconduct for a prosecuting attorney to become overcome with emotion when attempting to recount these incidents to a jury. And the record appears clear that the prosecutor's tears were not shed to inflame the passions of the jury or deliberately to impact the outcome of the case but were the result of an uncontrollable surge of emotion in the midst of a multi-day jury trial. In fact,

---

[19] 825 S.W.2d 272 (Ky. 1992).

12

the prosecutor even momentarily paused to regain her composure before continuing the argument. There was no prosecutorial misconduct by this display of emotion.

### 3. *The Commonwealth's description of the physical acts.*

As for the prosecution's vivid description of the acts themselves, we likewise see no error. The prosecution described the nature of the offenses as follows:

> He's not putting his penis in her anus or putting it in her vagina. There's no allegation of that. What he's physically doing to her doesn't hurt her. That's why she's not telling. It's not hurting her. There's no bleeding. There's no ripping, there's no tearing.

Soloway objected to this language and was overruled. The Commonwealth continued:

> So there's no ripping, there's no tearing, there's no bruising, there's nothing like that.

Soloway argues that this language was overly graphic and unduly prejudicial to his defense. We disagree.

One of Soloway's defenses at trial was the lack of physical evidence proving he committed the crimes. So naturally, in response to that argument, the Commonwealth is within its right to distinguish the particular crimes before the jury and explain why Soloway may still be found guilty without the physical evidence acquired in a host of other sex crimes. In *Mullins v. Commonwealth,* we reaffirmed the "longstanding rule…that counsel may comment and make all legitimate inferences that can reasonably be drawn

13

from the evidence presented at trial."[20] Prosecutors are extended considerable leeway in conducting a closing argument. She may "comment on tactics, may comment on evidence, and may comment as to the falsity of a defense position."[21] We cannot review this statement in a vacuum—it must be evaluated within the context of the argument as a whole. However disturbing this language may seem to an average listener, we agree with the trial court that it is not overly prejudicial and did not undermine Soloway's right to a fair trial.

## III. CONCLUSION.

Because we hold that the Commonwealth committed prosecutorial misconduct in its commentary relating to Soloway's post-arrest silence, we reverse the trial court judgment and remand for new trial.

All sitting. All concur.

---

[20] 350 S.W.3d 434, 439 (Ky. 2011).

[21] *Slaughter v. Commonwealth,* 744 S.W.2d 407, 412 (Ky. 1987).

14

COUNSEL FOR APPELLANT:

Shannon Renee Dupree
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Joseph Todd Henning
Assistant Attorney General