246 S.W.3d 448 (2007)
W.D.B. (a Child Under Eighteen), Appellant.
v.
COMMONWEALTH of Kentucky, Appellee.
No. 2006-SC-000937-DG.
Supreme Court of Kentucky.
November 21, 2007.
*449 Timothy G. Arnold, Assistant Public Advocate, Frankfort, KY, Counsel for Appellant.
Gregory D. Stumbo, Attorney General of Kentucky, Perry T. Ryan, Assistant Attorney General, Frankfort, KY, Counsel for Appellee.
Opinion of the Court by Justice MINTON.
Primarily at issue in this case is whether the common law presumption of youthful incapacity for criminal activity, the so-called infancy defense, survived enactment of the Kentucky Unified Juvenile Code, Kentucky Revised Statutes (KRS) Chapters 600 to 645. Because our juvenile code is comprehensive in scope and rehabilitative in purpose, we conclude that its enactment extinguished the infancy defense in proceedings under the juvenile code. And we affirm the Court of Appeals on this issue.
In addition to the applicability of the infancy defense, W.D.B. presents three additional issues for our review. They are: (1) whether the trial court erred in finding  despite uncontradicted expert testimony to the contrary  that W.D.B. had the capacity to commit the offense of first-degree sexual abuse; (2) whether the trial court erred in concluding  based solely on the uncorroborated confession of W.D.B.  that W.D.B. touched the victim; and (3) whether the trial court erred in declining to hold a Daubert[1] hearing to determine *450 the reliability of the methods used by the Commonwealth to evaluate W.D.B. for treatment as a sexual offender. We affirm on these three issues because we agree with the Court of Appeals that the trial court did not err.

I. FACTS AND PROCEDURAL HISTORY.

The juvenile session of the district court determined after an adjudication hearing that W.D.B. had committed the offense of first-degree sexual abuse, an act that if committed by an adult would be a felony. At the time W.D.B. committed the act against the then three-year-old victim, W.D.B. was twelve years old. Specifically, W.D.B. admitted that he was playing at a neighbor's pool with another boy, who was eight years old, and the three-year-old victim. W.D.B. went behind a shed with the two little boys and told the three-year-old to pull his shorts down, which the little boy did. When the three-year-old pulled his shorts down, W.D.B. touched the boy's penis.
In making its determination, the district court held as a matter of law that the common law presumption that a child is without criminal capacity was not applicable in proceedings under the juvenile code. As a result of the adjudication, the district court committed W.D.B. to the Department of Juvenile Justice as a juvenile sexual offender under KRS 635.510.
On appeal to the circuit court, the circuit court affirmed the decision of the district court on all issues as described in the introduction of this opinion. The Court of Appeals granted discretionary review and, likewise, affirmed on all issues. We granted discretionary review.

II. RESOLUTION AND DISCUSSION OF THE ISSUES.

A. The Enactment of the Kentucky Unified Juvenile Code Extinguished the Common Law Presumption that a Child is Without Criminal Capacity.
Since the enactment of the Kentucky Unified Juvenile Code, the common law presumption that a child lacks criminal capacity is no longer necessary for two reasons. First, a delinquency adjudication in juvenile court is not a criminal conviction. Second, allowing the presumption would frustrate the clinical and rehabilitative purposes of the juvenile code. The resolution of the common law presumption issue is one of statutory interpretation and application. So it is purely a question of law and subject to de novo review by this Court.[2]
The presumption of youthful incapacity for crime arose in Kentucky law as early as 1877.[3] The presumption holds that "[t]he arbitrary age below which a child is incapable of committing crime is seven. Between the ages of seven and fourteen, a presumption of incapacity lies, which, however, may be overcome by evidence."[4] This presumption is often referred to as the "infancy defense."
Before Kentucky's creation of the juvenile court in 1906, the common law presumption was invaluable because our criminal law did not make distinction for a child. Every person, regardless of age, *451 went to the adult criminal court because there was no juvenile court. But juvenile court legislation forever changed the focus from punishing all persons in criminal court to providing care, treatment, correction, and control for children in a juvenile court.[5] Since 1906, juvenile court legislation has evolved from the original, ten-section statute to a comprehensive and elaborate juvenile code that encompasses ten statutory chapters, KRS Chapters 600 to 645, having the following express legislative purposes:
(d) Any child brought before the court under KRS Chapters 600 to 645 shall have a right to treatment reasonably calculated to bring about an improvement of his or her condition and, to the extent possible, have that treatment administered in the county of residence of the custodial parent or parents or in the nearest available county;
(e) KRS Chapter 635 shall be interpreted to promote the best interests of the child through providing treatment and sanctions to reduce recidivism and assist in making the child a productive citizen by advancing the principles of personal responsibility, accountability, and reformation, while maintaining public safety, and seeking restitution and reparation;
(f) KRS Chapter 640 shall be interpreted to promote public safety and the concept that every child be held accountable for his or her conduct through the use of restitution, reparation, and sanctions, in an effort to rehabilitate delinquent youth; and
(g) It shall further be the policy of this Commonwealth to provide judicial procedures in which rights and interests of all parties, including the parents and victims, are recognized and all parties are assured prompt and fair hearings. Unless otherwise provided, such protections belong to the child individually and may not be waived by any other party.[6]
Nowhere in this comprehensive legislation is a presumption that a child lacks criminal capacity, the reasons being that (1) a delinquency adjudication in juvenile court is not a criminal conviction[7] and (2) allowing the presumption would frustrate the clinical and rehabilitative purposes of the juvenile code. In short, we conclude that the juvenile code extinguished the common law presumption.[8]
W.D.B. argues that the common law presumption arose to protect children from the assumption that all criminal acts are accompanied by a criminal mental state. In other words, W.D.B. believes that a court's failure to allow the presumption results in children being adjudicated guilty *452 of crimes of which they are innocent. But this is a policy argument. And
[t]he establishment of public policy is granted to the legislature alone. It is beyond the power of a court to vitiate an act of the legislature on the grounds that public policy promulgated therein is contrary to what the court considers to be in the public interest. It is the prerogative of the legislature to declare that acts constitute a violation of public policy.[9]
As stated above, the legislature enunciated the purposes of the juvenile code and enacted comprehensive legislation to carry into effect those purposes. The legislature did not codify the presumption, and this Court is without authority to write such a presumption into the juvenile code on the grounds of public policy.[10]
W.D.B. further contends that he should have been permitted to rely on the infancy defense in the adjudication hearing, which would then have required the Commonwealth to prove W.D.B.'s mental state. He insists that in the absence of the presumption, the trial court was allowed to assume that W.D.B.'s cognizance of the criminal nature of his conduct was no different from that of a mature adult.
This argument, however, is premised on mental state or mens rea as opposed to capacity. Capacity, in terms of the presumption at issue, refers not to criminal intent, but to the ability to comprehend right from wrong. The trial court's ruling that the presumption was inapplicable in no way relieved the Commonwealth of its burden of proof beyond a reasonable doubt of the requisite elements of the offense.[11]
As we see it, the crux of W.D.B.'s challenge in this appeal is that in light of the expert testimony on W.D.B.'s mental health, the Commonwealth did not establish beyond a reasonable doubt every fact necessary to constitute the offense of first-degree sexual abuse. But on this challenge  as we will discuss in later sections of this opinion  we conclude that it was not clearly unreasonable for the trial court to find W.D.B. guilty of the offense.
Finally on this issue, we address W.D.B.'s reliance on Davis v. Commonwealth,[12] a more recent Kentucky case that cites to Thomas.[13]Davis has no application to this case. Davis involved a challenge to a criminal conviction for wanton murder and first-degree criminal abuse. It was not an adjudication under the juvenile code, and the presumption was not dispositive of any issue in the case.[14]
B. Based on the Expert Testimony, the Trial Court Did Not Err in Finding that W.D.B. Had the Capacity to Commit the Offense of First-Degree Sexual Abuse.
We begin our discussion of this issue with the various standards of review implicated in juvenile proceedings. The adjudication hearing is conducted by the court without a jury.[15] Accordingly, under Kentucky Rules of Civil Procedure (CR) 52.01, "[f]indings of fact shall not be set aside unless clearly erroneous, and due *453 regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." A trial court's factual finding is not clearly erroneous if supported by substantial evidence.[16]
When a juvenile challenges the sufficiency of the evidence, because the Commonwealth carries the same burden of proof as it does in an adult criminal case to show that a juvenile committed an offense, we borrow from the criminal law and apply the directed verdict standard of review.[17] Thus, in the case of a juvenile adjudication, a reviewing court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth and determine if, under the evidence as a whole, it would be clearly unreasonable for the trial court to find guilt, only then the juvenile is entitled to a directed verdict of acquittal.[18]
In this case, the trial court made a factual finding at the end of the adjudication hearing that W.D.B. had criminal capacity at the time the crime occurred. W.D.B. contends that it was clearly unreasonable in light of the uncontroverted testimony of Dr. Michael A. Nicholas to find against him on this question. While Dr. Nicholas's testimony may have been uncontroverted by another mental health expert, we agree with the courts below that it was inconclusive on the issue of W.D.B.'s criminal capacity and refuted by the other evidence.
Dr. Nicholas testified that he is in private practice in clinical psychology with a specialty in neuropsychology. He evaluated W.D.B. after the incident involving the three boys. In reviewing W.D.B.'s psychiatric records, Dr. Nicholas learned that when W.D.B. was in kindergarten, an older child forced him to pull his pants down and then touched his private parts. Dr. Nicholas stated that he agreed with the recent diagnosis from the River Valley Psychiatric Hospital that W.D.B. had bipolar disorder with mixed features, which is a very serious mental health issue. And because W.D.B. had this serious mental health issue and other severe mental health issues, Dr. Nicholas opined that W.D.B. most probably did not have the capacity to distinguish right from wrong at the time he allegedly committed the act.
On further direct examination by W.D.B.'s counsel, Dr. Nicholas explained that failure to take his prescribed medications, or an unstructured environment, or failure to receive therapy could adversely impact W.D.B.'s mental health and trigger an acute manic episode. During such an episode, W.D.B.'s capacity to know right from wrong would be diminished. But when asked, "Did he have the capacity or not," Dr. Nicholas would only go so far as to say:
Putting it in black and white terms like that, you know, I have to fall back to what I said in my report. He may have not had the capacity. Because I think short of direct observation, there is no evaluator that is going to tell you he did or he didn't. You know, short of that, that's unfortunately  I'm a psychologist, not an attorney or a member of the *454 court. I can't say that, you know, what I'm saying is it raises the question in my professional opinion with a severe mental disorder with four psychiatric hospitalizations that we know about. You know, that we know about. We have an individual with diminished capacity. The extent of the diminished capacity at the time that this act occurred, I wasn't there. You know, I don't know. I don't know if he was having a good day or a bad day. You know, I don't know if he had been taking his meds for at least a week before or as, as prescribed or he had been, been all over the place. I don't know if he received therapy or any kind of group intervention. I don't know any, any of that information. I do know that he has a diminished capacity. To the extent, I don't know. And I don't think any evaluator can tell you.
Dr. Nicholas agreed with the court that having information regarding W.D.B.'s management of his mental health issues would have been helpful to his determination of capacity.
In addition to his testimony at the adjudication hearing, Dr. Nicholas prepared a written report, which he referenced at the hearing. In a similar vein, Dr. Nicholas concludes in his report:
[W.D.B.'s] capacity for knowing the wrongfulness of his actions is difficult to assess given the fluctuating mood stability that appears is a part of his history. It is possible that in a manic or hypomanic episode [W.D.B.] may not have been capable of the [judgment] to avoid committing [the act] that precipitated his arrest. His adherence to his treatment regime may have also had an effect on his capacity to appreciate the wrongfulness of his act.
The trial court withheld its determination on capacity until it heard all the evidence in the case. That evidence included the testimony of a police officer and the father of the three-year-old. The eight-year-old boy, J.L., began to testify at the hearing but could not complete his testimony from the point that the three boys went behind the shed because he was crying and too upset to talk.
The police officer testified that W.D.B. initially denied that he was at the three-year-old's home. But he eventually admitted to the officer that he told the three-year-old to undo his pants and that he touched the little boy's penis. The officer conceded that although W.D.B. was calm when he admitted the touching, when he initially arrived at W.D.B.'s home, W.D.B. was running around in circles and cursing.
The three-year-old's father testified that his son, J.L., and W.D.B. were playing at his home. His son and J.L. were playing in the pool, and W.D.B. was swinging. W.D.B. left the yard for about ten minutes, but then he came back. The father observed the three boys go behind a small building in the back yard. After about two minutes, the father went to see what the boys were looking at behind the building. When he reached the boys, he saw that his son had his trunks pulled down like he was going to the bathroom. And he noticed that W.D.B. had an erection under his blue, mesh shorts. When the father came around the building, W.D.B. panicked and told the father to leave him alone. According to the father, W.D.B. said that the boys came back there while he was using the bathroom. W.D.B. then started cursing. The father told W.D.B. to go with him to talk to W.D.B.'s mother, but W.D.B. jumped on his bicycle and left.
Weighing Dr. Nicholas's opinion against W.D.B.'s admission to the police officer and the events surrounding the act as observed by the three-year-old's father, we conclude that it was not clearly unreasonable to find guilt. Moreover, the trial *455 court's finding that W.D.B. had the capacity to discern right from wrong is evidenced by: his seclusion of the two boys behind the shed, the story he told the three-year-old's father, his becoming upset and having an episode after the act occurred  not before  and his eventually leaving the scene. This evidence is substantial. So the trial court's finding is not clearly erroneous.
C. The Trial Court Did Not Rely Solely on W.D.B.'s Confession in Concluding that the Commonwealth Had Established Beyond a Reasonable Doubt that W.D.B. Had Committed First-Degree Sexual Abuse.
Under Kentucky Rules of Criminal Procedure (RCr) 9.60, "[a] confession of a defendant, unless made in open court, will not warrant a conviction unless accompanied by other proof that such an offense was committed." "The corroborative evidence required addresses itself as to whether the crime charged was committed [corpus delicti] and not as to whether the particular defendant committed it."[19]
"Although proof beyond a reasonable doubt is necessary to convict of a criminal offense, the proof required by RCr 9.60 to corroborate an extrajudicial confession need not be such that, independent of the confession, would establish the corpus delicti or Appellant's guilt beyond a reasonable doubt[.]"[20] Proof of the corpus delicti, i.e., that W.D.B. actually committed the offense of first-degree sexual abuse, may be established by considering the confession, as well as the corroborating evidence.[21] Thus, even if the circumstantial evidence in a case standing alone would not suffice to prove guilt beyond a reasonable doubt, it can suffice to corroborate an out-of-court confession.[22] And the circumstantial evidence and the confession considered together can constitute sufficient proof to take the case to the jury, or in this case, submit it to the trial court.[23]
W.D.B. argues that the preceding holding in Blades is dictum and, therefore, not binding in this case. We disagree. This part of the Blades opinion was the critical step in deciding the issue. In Blades, a jury convicted Blades of driving under the influence; however, no evidence placed Blades in the driver's seat of the car other than Blades himself in an out-of-court confession, which he recanted at trial. This Court upheld the conviction based on the circumstantial evidence that (1) witnesses observed Blades staggering in the roadway; (2) troopers located Blades walking down the roadway; (3) Blades failed to pass field sobriety tests, as well as a breathalyzer; and (4) Blades's vehicle was found abandoned in the center of the roadway with the engine still running. This evidence corroborated his out-of-court admission to the troopers that he had driven the vehicle to its location.
Turning to the evidence in this case, in articulating its decision that W.D.B. committed the offense of first-degree sexual abuse, the trial court stated that it was *456 relying on W.D.B.'s confession and the father's testimony. The father testified that he walked around the shed and found his son with his pants down in W.D.B.'s company and observed that W.D.B. had an erection. So the trial court relied on the out-of-court confession and other proof, albeit circumstantial.
This is not an offense that will always result in physical evidence  such as the corpse of a murdered person  that the crime occurred. The offense is any touching of the sexual parts of a person, who, in this case, was incapable of consent because he was less than twelve years old, done for the purpose of satisfying the sexual desire of W.D.B.[24] The Commonwealth's proof corroborated the circumstances of the crime to which W.D.B. confessed: the time, the persons present, the place, the three-year-old victim with his swim trunks down and penis exposed, and W.D.B. with an erection. Just as in Blades, no competent witness testified that W.D.B. actually touched the victim. But there was certainly other compelling proof that such an offense was committed.[25] There was no error.
D. The Trial Court Did Not Err in Declining to Hold a Daubert Hearing to Determine the Reliability of the Methods Used By the Commonwealth to Evaluate W.D.B. for Treatment as a Sexual Offender.
Upon review, we conclude that the trial court heard extensive evidence relating to W.D.B.'s sexual offender assessment under KRS 635.510 before deciding the appropriate placement and treatment for W.D.B. Two qualified professionals who evaluated W.D.B. opined that based on their assessments, W.D.B. presented a risk (one said moderate and one said high) to re-offend and recommended that W.D.B. receive treatment in a sex offender treatment program. Thus, we conclude that the trial court sufficiently performed its gatekeeper function and did not err in declining to hold a Daubert hearing to determine the reliability and validity of the instruments utilized in part by the qualified professionals before declaring that W.D.B. was a sexual offender.
Under KRS 635.510,
(2) (a) A child, less than thirteen (13) years of age, may be declared a juvenile sexual offender if the child has been adjudicated guilty of an offense listed in KRS 635.505(2).
. . . .
(3) Upon final adjudication by the juvenile court under subsection (2) of this section, the juvenile court judge shall order a juvenile sexual offender assessment to be conducted on the child by the Department of Juvenile Justice treatment program or by a qualified professional approved by the program which shall recommend whether the child be declared a sexual offender and receive sexual offender treatment. Upon receipt of the findings of the assessment, the juvenile court judge shall determine whether the child shall be declared a juvenile sexual offender, and, if so, shall initiate a referral to the Department of Juvenile Justice treatment program for treatment.
KRS 635.505(2)(a) includes a felony under KRS Chapter 510; and W.D.B. had been adjudicated guilty of first-degree sexual abuse, a felony, under KRS 510.110.
As further defined in KRS 635.505(3),

*457 [a] `juvenile sexual offender assessment' means an assessment of the child's adolescent social development, medical history, educational history, legal history, family history, substance abuse history, sexual history, treatment history, and recent behaviors, which shall be prepared in order to assist the courts in determining whether the child should be declared a juvenile sexual offender, and to provide information regarding the risk for reoffending and recommendations for treatment.
In W.D.B.'s case, Susan Mead, who holds a master's degree in social work and who is a juvenile sex offender certified counselor with the Department of Juvenile Justice (DJJ), evaluated W.D.B. and prepared a psychosexual evaluation. The purpose of the evaluation was to provide risk assessment, treatment, and placement recommendations to the trial court. To prepare her assessment, Ms. Mead utilized the following tests to evaluate W.D.B.: the Juvenile Sex Offender Assessment Protocol-ll (J-SOAP-II) and the Estimate of Risk of Adolescent Sexual Offense Recidivism (ERASOR). She also interviewed W.D.B. and his mother; and she reviewed medical records, police records, and reports from a former teacher of W.D.B.'s.
Based on the assessment instruments, Ms. Mead reported that W.D.B. could be considered overall a high risk to re-offend sexually. She made the following recommendations to the trial court: W.D.B. should be committed to DJJ as a sexual offender, he should be placed into a residential facility that provides a sexual offender treatment program to address his sexual offending behavior and allow him to develop the skills necessary to control his sexual urges, he should not have any unsupervised contact with children under the age of consent, and he should be monitored for further psychiatric symptoms.
In W.D.B.'s disposition hearing, Ms. Mead testified as to her evaluation and the instruments she used. She stated that adolescent sexual offense recidivism is a very recent field of study. In her belief and experience, the J-SOAP-II and ERASOR instruments are the most promising in the field; although, she readily admitted that there is no assessment tool at this time that is considered empirically valid for risk assessment.
W.D.B.'s counsel cross-examined Ms. Mead at length as to the validity of the two instruments and her methods in scoring and evaluating W.D.B.'s information. She stated that the reliability (consistency of results) of the J-SOAP-II test was good, but the validity (the test measures what it was intended to measure) was not as good because it was not based on a high population. As to scoring the J-SOAP-II, Ms. Mead agreed that the protocol manual for the test emphasized that two clinicians should score the individual. Ms. Mead did not have another individual score W.D.B., but she did ask a Ph.D. level psychologist to review and discuss W.D.B.'s scores with her.
After the disposition hearing, W.D.B. requested a Daubert hearing to determine the reliability and validity of the contents and recommendations of Ms. Mead's report. W.D.B. also requested that the trial court approve funds for a second expert evaluation. Relying, in part, on Hyatt v. Commonwealth[26] and noting the fact that this was not a jury trial and it had the opportunity to assess the credibility of the witnesses, the trial court denied the request for a Daubert hearing. The trial court did, however, approve the motion for funds for a second expert evaluation.
*458 Edward J. Connor, Psy.D., performed the second psychological/sex offender evaluation. He reviewed W.D.B.'s ERASOR and J-SOAP-II evaluations as scored by Ms. Mead. He noted five discrepancies between his interview with W.D.B. and the ERASOR evaluation conducted by Ms. Mead. W.D.B.'s counsel cross-examined Ms. Mead on these perceived discrepancies when she testified in the disposition hearing. In Dr. Connor's opinion, a recalculation of the scores on both tests could lower W.D.B.'s degree of risk of re-offending from a "high risk" to re-offend to a "moderate risk" to re-offend. Dr. Connor concluded his evaluation by discussing W.D.B.'s mental health issues, including bipolar disorder and a sleep disorder, and ways in which each could lead to other episodes and behaviors. In addition, consistent with Ms. Mead's assessment, he agreed that W.D.B. should not have any unsupervised contact with children under the age of consent until his psychiatric disorders are clearly under control and he is involved with a sex offender treatment program.
Shortly after receiving Dr. Connor's evaluation, the trial court declared under KRS 635.510 that W.D.B. was a sexual offender.
An actual Daubert hearing is not required when the evidence is utilized in a dispositional, rather than an adjudicatory, context.[27] Here, the trial court had already adjudicated W.D.B. guilty of the offense of first-degree sexual abuse. DJJ used the instruments to conduct a juvenile sexual offender assessment on W.D.B. as required by KRS 635.510. In turn, the trial court utilized the assessment to decide appropriate treatment for W.D.B. Because it did not consider the assessment for adjudicatory purposes, we believe that cross-examination regarding the reliability and validity of the tests at issue was sufficient to protect W.D.B.'s due process rights. Moreover, although Dr. Connor noted discrepancies between Ms. Mead's evaluation and his interviews, he relied on the same instruments in his assessment.
The trial court reviewed all the evidence presented by both sides. And the trial court followed the guidelines of KRS 635.510. We find no error.

IV. CONCLUSION.

The Kentucky Unified Juvenile Code extinguished the common law presumption that a child is without criminal capacity. Under the evidence as a whole in this case, we conclude that it was not clearly unreasonable for the trial court to find guilt. W.D.B.'s out-of-court confession was accompanied by other proof that such an offense was committed. Finally, an actual Daubert hearing was not required in the disposition context when the evaluator was subject to cross-examination, and W.D.B. had the opportunity to refute the results of the sexual offender assessment.
Accordingly, we affirm the Court of Appeals.
All sitting. LAMBERT, C.J.; ABRAMSON, CUNNINGHAM, NOBLE, and SCOTT, JJ., concur.
SCHRODER, J., concurs in part and dissents in part by separate opinion.
Opinion by Justice SCHRODER concurring in part and dissenting in part.
I agree with the majority opinion in all respects except for its analysis of the requirement for corroboration of a confession *459 under RCr 9.60. I believe the majority is mistaken as to the proper method of conducting an RCr 9.60 analysis.
"Out of extraordinary caution and because of concerns about the reliability of confessions obtained by police behind closed doors, a requirement of corroboration for confessions has been a staple of Kentucky criminal law for most if not all of the state's history." Robert G. Lawson, The Kentucky Evidence Law Handbook, § 11.25[1] (4th ed.2003). The corroboration requirement is set forth in RCr 9.60: "A confession of a defendant, unless made in open court, will not warrant a conviction unless accompanied by other proof that such an offense was committed."
The majority starts with the confession, and then is satisfied by finding that there is some evidence that "corroborates" it. This is not the approach Kentucky law requires. In Slaughter v. Commonwealth, 744 S.W.2d 407 (Ky.1987), this Court explained what the "other proof" portion of RCr 9.60 entails:
The corroborative evidence required addresses itself as to whether the crime charged was committed and not as to whether the particular defendant committed it. Such proof, very simply, must be independent of any out-of-court confession, and must show that the charged crime was, in fact, committed. Once such evidence is present, guilt of the defendant may be proven by the evidence of the confession(s). The rule, in its effect, requires that the corpus delicti of the crime be proven by independent, corroborative evidence.
Id. at 410 (citations omitted). "Phrased in another way it may be said that the first requirement of the Commonwealth in a criminal prosecution is to establish that a crime has been committed. This cannot be established solely by an out-of-court confession." Dolan v. Commonwealth, 468 S.W.2d 277, 282 (Ky.1971). See also, Wilson v. Commonwealth, 476 S.W.2d 622, 624 (Ky.1971); Stewart v. Commonwealth, 561 S.W.2d 660 (Ky.1977).
But what amount of independent proof that a crime was committed is sufficient to satisfy RCr 9.60? Slaughter instructs that the independent proof must show that the statutory elements of the crime are present. 744 S.W.2d at 410. Blades v. Commonwealth, 957 S.W.2d 246, 250 (Ky.1997), held that the independent proof does not have to establish the corpus delicti beyond a reasonable doubt, but by a lesser standard, which Professor Lawson compares to a "preponderance of the evidence." Lawson, supra, § 11.25[2]. Only when the independent evidence establishes the corpus delicti, albeit by this lesser standard, is RCr 9.60 satisfied. The majority skips this preliminary analysis of the independent evidence.
The majority misapplies the phrase in Blades which states "proof of the corpus delicti . . . may be established by considering the confession as well as the corroborating evidence." 957 S.W.2d at 250. This concept is taken from Lacey v. Commonwealth, 251 Ky. 419, 65 S.W.2d 61 (1933), and refers to proving the corpus delicti beyond a reasonable doubt to sustain a conviction  after the corroboration requirement (now RCr 9.60) has been satisfied, and the confession admitted. Only if sufficient independent evidence is shown, may the confession and independent evidence be considered together by the trier of fact to find a defendant guilty (corpus delicti plus identity beyond a reasonable doubt).
Therefore, the question (skipped by the majority) we need to consider is, does the independent proof show that the elements of first degree sexual abuse are present? KRS 510.110 provides, in relevant part:

*460 (1) A person is guilty of sexual abuse in the first degree when:
. . .
(b) He or she subjects another person to sexual contact who is incapable of consent because he or she:
. . .
2. Is less than twelve (12) years old.
"Sexual contact" is defined in KRS 510.010(7) as "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying the sexual desire of either party."
The independent proof in this case is as follows. A three-year-old boy, an eight-year-old boy, and the twelve-year-old Appellant had been swimming and swinging in the backyard of the three-year-old's house. The three-year-old's father noticed the three boys had gone behind a shed. A few minutes later, he went to investigate. The three-year-old had his pants down. The twelve-year-old Appellant was standing two or three feet away, and the father believed he saw an erection in the Appellant's pants. Appellant told the father to leave him alone and that the others had come back there while he was using the bathroom. Appellant left on his bike. The father walked over to the Appellant's parents' house, and the police were called. When questioned by a police officer, Appellant ran around in circles, yelling and cursing.
The independent evidence in this case is circumstantial, and the corpus delicti may be shown by circumstantial evidence. Blades, 957 S.W.2d at 250. However, the circumstantial evidence must be more consistent with guilt than with innocence. Dolan, 468 S.W.2d at 282. In this case, I believe the evidence is as consistent with innocence as with guilt. Accordingly, I do not believe RCr 9.60 was satisfied. The majority is critical of the corroboration requirement in this case because sexual abuse cases may not always result in physical evidence that it occurred. However, the law should not be nullified through interpretation to achieve a desired result. Further, the protection afforded by the corroboration requirement becomes particularly critical in a case such as this one, when the confession is taken from a twelve-year-old child with a lower than average IQ.
NOTES
[1] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
[2] Bob Hook Chevrolet Isuzu, Inc. v. Commonwealth Transp. Cabinet, 983 S.W.2d 488, 490 (Ky.1998).
[3] Willet v. Commonwealth, 76 Ky. 230 (Ky. 1877); see Heilman v. Commonwealth, 84 Ky. 457, 1 S.W. 731 (Ky.1886).
[4] Thomas v. Commonwealth, 300 Ky. 480, 189 S.W.2d 686, 687 (Ky.1945).
[5] Ky. St. § 331e, Russell's St. § 3259 (March 21, 1906).
[6] KRS 600.010.
[7] KRS 635.040.
[8] See, e.g., In re Tyvonne, 211 Conn. 151, 558 A.2d 661, 666 (Conn. 1989) (holding that common law presumption of incapacity had been displaced by state juvenile statutes in delinquency proceedings against eight-year-old found delinquent in shooting a schoolmate); In Interest of G.T., 409 Pa.Super. 15, 597 A.2d 638, 642 (Pa.Super.Ct.1991) (holding that common law presumption of incapacity had been supplanted by state juvenile code in delinquency proceedings against thirteen-year-old found delinquent in drug offense); In re Michael, 423 A.2d 1180, 1183 (R.I.1981) (reasoning that paramount right in juvenile proceeding that every element of offense giving rise to delinquency or waywardness charge be proved beyond a reasonable doubt and holding that finding of capacity was unnecessary in a juvenile proceeding against twelve-year-old adjudicated wayward in sexual assault against five-year-old girl).
[9] Commonwealth ex rel. Cowan v. Wilkinson, 828 S.W.2d 610, 614 (Ky.1992).
[10] Id.
[11] KRS 610.080(2); In re Winship, 397 U.S. 358, 365, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (holding that juveniles are constitutionally entitled to proof beyond reasonable doubt when they are charged with an act which would constitute a crime if committed by an adult).
[12] 967 S.W.2d 574, 581 (Ky.1998).
[13] 189 S.W.2d at 687.
[14] Id.
[15] KRS 610.070(1).
[16] Owens-Corning Fiberglas Corp. v. Golightly, 976 S.W.2d 409, 414 (Ky.1998).
[17] See In re J.S., 35 S.W.3d 287, 292 (Tex. App.2001) ("Given the fact that the State carries the same burden of proof in a juvenile proceeding as it does in an adult criminal case to show that the juvenile committed a penal offense and the quasi-criminal aspect inherent to juvenile proceedings, it seems more appropriate to apply the more stringent criminal standard of review to challenges to the legal sufficiency of the evidence to establish the commission of the offense in the adjudication phase.")
[18] Commonwealth v. Benham, 816 S.W.2d 186, 187 (Ky.1991); Commonwealth v. Sawhill, 660 S.W.2d 3, 4 (Ky.1983).
[19] Slaughter v. Commonwealth, 744 S.W.2d 407, 410 (Ky.1987); see Wilson v. Commonwealth, 476 S.W.2d 622, 624 (Ky.1971) ("The only corroboration required for a confession not made in open court is proof, independent of the confession, that the offense was actually committed. Once the commission of the offense is established, the confession alone is sufficient proof that the confessor committed the crime.").
[20] Blades v. Commonwealth, 957 S.W.2d 246, 250 (Ky. 1997).
[21] Id.
[22] Id.
[23] Id.
[24] KRS 510.110 and KRS 510.010(7) (defining sexual contact).
[25] RCr 9.60.
[26] 72 S.W.3d 566, 575 (Ky.2002).
[27] See Douglas v. Commonwealth, 83 S.W.3d 462, 464 (Ky.2001) (holding that sentencing judge was not required to hold Daubert hearing before considering presentence report containing results of tests that were administered to assess defendant's risk of recidivism).