304 S.W.3d 67 (2009)
J.S., a Child, Appellant,
v.
COMMONWEALTH of Kentucky, Appellee.
No. 2009-CA-000805-ME.
Court of Appeals of Kentucky.
October 30, 2009.
Discretionary Review Denied by Supreme Court March 10, 2010.
*68 Gail Robinson (argued), Assistant Public Advocate, Frankfort, KY, for appellant.
Jack Conway (argued), Attorney General of Kentucky, J.J. Alleman (argued), Special Assistant Attorney General, Lexington, KY, for appellee.
Before ACREE, CAPERTON and KELLER, Judges.

OPINION
ACREE, Judge.
J.S., a child under the age of eighteen, seeks reversal of the Fayette County Family Court decision committing him to the Cabinet for Health and Family Services (Cabinet) as a habitual runaway. The family court determined that commitment was necessary to end J.S.'s delinquent behavior and ensure his safe withdrawal from a local gang. J.S.'s status as a habitual runaway, coupled with his extensive involvement with the gang, rendered community-based alternatives inadequate. The decision of the family court is affirmed.
J.S. is an eleven-year-old boy who joined a local gang at the age of nine. On January 23, 2009, J.S.'s father filed a habitual runaway complaint against J.S.[1] A detention hearing took place on January 26, 2009. During this hearing, a member of the Department of Juvenile Justice (DJJ) reported knowledge of J.S.'s desire for gang involvement and J.S.'s father acknowledged the gang's interference with his child's life. J.S. admitted that he was a gang member and that his friends encouraged him not to return home. In response, the family court judge suggested that his father consider removing J.S. from the community to get him away from the gang's influence. J.S. was subsequently released to his parents and the court asked that a diversion plan be implemented. J.S. was instructed that he should attend school and not run away.
Two days later, J.S. ran away and did not return home. On February 2, 2009, J.S.'s father filed a second habitual runaway complaint and a missing persons report. J.S. was apprehended and a detention hearing was conducted the following day. J.S. stipulated to being a habitual runaway and being in contempt of the family court's order to attend school and not run away.[2] J.S. was asked to identify the person with whom he spent time once he had run away. J.S.'s counsel  who was familiar with the undisclosed individual  advised J.S. not to reveal the name because it would put the boy in danger. Once again, the court suggested that J.S.'s father consider moving so that J.S. would be out of the gang's reach.
Subsequently, the Department of Youth Services (DYS) in Fayette County filed a disposition report. This report indicated that J.S.'s father believed J.S. was using drugs and hanging out with gang members. J.S.'s gang membership was confirmed by a gang resource officer of the Fayette County Police Department.
*69 The report further revealed that J.S. received discipline at school for bullying, unexcused absences and physical aggression. Specifically, his school record indicates numerous instances of skipping class, at least one of which involved J.S.'s leaving campus with older students from another school. J.S. also received discipline for choking, pushing, and kicking other students. Despite his disciplinary record, the report reveals that J.S. is an above-average student who lives with both parents, and that there are no signs of abuse in his home. However, J.S. did not follow his parents' rules and was often aggressive.
Ultimately, the disposition report recommended J.S.'s commitment to the Cabinet. It concluded that, as a result of J.S.'s poor choices, he would be in great danger if allowed to return to his community and might "ultimately lose his life."
On March 18, 2009,[3] the family court reviewed the disposition report. A gang resource officer testified that J.S. was an active gang member and that videos and photos were taken of J.S. giving gang signs and wearing gang paraphernalia. He also reported that photos of gang members with weapons and drugs were coupled with photos of J.S. on the internet site, myspace.com. Further, the officer received reports that gang members passed firearms to J.S. when they were approached by police. However, they had not substantiated this fact because, prior to receiving the report, it was not their practice to search children. The officer also indicated that the victim of a gang-initiation assault identified J.S. as a participant; however, this charge was not filed because it was barred by the statute of limitations. Additionally, the officer received a report that J.S. was involved in the "sex in"[4] of an adult female, an allegation J.S. denied. The officer also testified that on one occasion J.S. was found in Masterson Station Park with an alleged gang leader after midnight with no parental supervision.
The family court judge inquired as to the difficulty J.S. might face if he withdrew from the gang. The officer informed the court that this gang used rituals called "beat outs" that involved physical assault lasting up to five minutes. Similar consequences resulted from the failure to "pay dues" or participate in criminal activity. While the gang afforded some tolerance to young members, the officer was familiar with instances in which young members were assaulted for failing to follow the gang's orders.
The gang resource officer informed the court that law enforcement would do its best to protect J.S. if he wished to withdraw his gang membership. However, this would take full cooperation on the part of J.S. and his parents.[5] The officer explained that if J.S. was willing to turn gang members over, the police could use this information to threaten the gang and persuade them to leave J.S. alone. However, *70 the officer found it difficult to say whether they could protect J.S. from all harm.
J.S. testified that he could not approach the gang and withdraw because he would be beaten up and that gang members would likely harm him if instructed by officers to leave him alone. Nevertheless, he did express his desire to fully cooperate with the police.
The family court judge concluded that J.S. could not return safely to his community. Once again, the court asked J.S.'s parents to consider moving to a safer community so that J.S. could return home. J.S.'s parents agreed to attempt the move and the court gave them four weeks to find a suitable location. Four weeks later, J.S.'s family proposed to move to a location approximately five miles away. However, the court determined that J.S. would still be in danger in the new location.
Ultimately the family court agreed with the disposition report and concluded that J.S. could not safely return to his community, even if he cooperated with the police.
Pursuant to Kentucky Rule(s) of Civil Procedure (CR) 52.01, factual findings of the family court judge must be upheld unless clearly erroneous. Factual findings are not clearly erroneous if they are supported by substantial evidence. W.D.B. v. Commonwealth, 246 S.W.3d 448, 452-53 (Ky.2007).
KRS 600.010(2)(c) instructs that "[t]he court shall show that other less restrictive alternatives have been attempted or are not feasible in order to insure that children are not removed from families except when absolutely necessary[.]" A program is the "least restrictive alternative" when:
[it] is no more harsh, hazardous, or intrusive than necessary; or involves no restrictions on physical movements nor requirements for residential care except as reasonably necessary for the protection of the child from physical injury; or protection of the community, and is conducted at the suitable available facility closest to the child's place of residence[.]
KRS 600.020(35) (emphasis supplied). Thus, the family court's decision must be upheld if there is substantial evidence in the record to support a finding that either: (1) all less restrictive alternatives were attempted, or (2) no feasible alternative to commitment existed.
The failure to make written findings regarding the inadequacy of available alternatives is not fatal to commitment. K.F. v. Commonwealth, 274 S.W.3d 457, 460 (Ky.App.2008). However, at the very least, the record itself must indicate that less restrictive alternatives were attempted or determined unfeasible. See X.B. v. Commonwealth, 105 S.W.3d 459, 461 n. 3 (Ky.App.2003).
In X.B. v. Commonwealth, a thirteen-year-old was committed to the Cabinet after being charged with multiple offenses. Id. at 460. This decision went against the recommendations of the disposition report. Id. Moreover, the court below "did not state that other less restrictive alternatives, such as probation, had been attempted or were not feasible." Id. at 461. Nor was there any "indication in the record that X.B. had ever been adjudicated delinquent of any offense or that he had been subjected to any form of treatment or probation by the juvenile justice system prior [to commitment.]" Id. Therefore, the court held that commitment was improper. Id. But the Court went on to state, "Had the record clearly indicated that X.B. had been before the court on previous occasions and that the court had attempted lesser restrictive alternatives, then the result ... may have been different." Id. at 461 n. 3. In X.B., "there [was] no indication that lesser restrictive alternatives *71 had been attempted or were not feasible." Id.
The case sub judice is distinguished from X.B. Here, the family court made an affirmative statement that available services were inadequate and that commitment was necessary to protect J.S. from physical harm. Specifically, the court determined that "offering services and reasonable effort[s] to assist in changing [J.S.'s] behavior [would] not offer the protection that [J.S.] needs to avoid the risk of abuse that would result if he is returned to the community." The family court found that J.S.'s involvement with the gang, and his status as a habitual runaway, rendered him unable to change his behavior and withdraw from the gang without suffering abuse. While the family court did not affirmatively state why the other alternatives were inadequate, the record indicates that other alternatives were considered. The family court judge questioned the gang resource officer at length about his ability to protect J.S. if he withdrew from the gang. While the officer indicated that, with J.S.'s full cooperation, law enforcement officers would protect him to the greatest extent possible. However, the family court determined, based on the officer's overall testimony, that even this protection would be inadequate.
Another scenario considered by the court was relocation. The court determined that J.S. was no longer safe within his own community and that relocation was necessary. In order to avoid commitment, the court asked the family to consider moving. The court did not order the family to move, but indicated that it could not return J.S. to the community where they lived.[6] While community-based services might be able to reform J.S.'s behavior, those services could not protect J.S. from the gang's reaction to his reformation.
This court recognizes the unique circumstances of this case. Generally, it is the child's prolonged delinquency and the justice system's inability to curb delinquent behavior that leads to commitment. In this case, J.S. has only appeared before the family court as a habitual runaway on two occasions. However, he has received discipline at school on numerous occasions for delinquent behavior. He has come to the attention of gang-resource law enforcement officers at an early age. Further, J.S.'s activities and the individuals with whom he chose to associate when he ran away escalated the gravity of the situation. The absence of a criminal record did not negate the delinquent nature of the activities in which he was engaged. The family court was not only faced with the need to protect J.S. from his own actions, but was also forced to protect J.S. from his own community. This need for protection directly resulted from J.S.'s delinquent behavior and his gang affiliation.
The family court concluded that commitment was necessary to protect J.S. from physical injury. To the extent less restrictive alternatives were available, they were considered by the family court and determined unfeasible.
Therefore, because there was substantial evidence indicating that returning J.S. to the community would subject him to violence, *72 and that no less restrictive alternative was feasible, the decision of the family court was not clearly erroneous and must be affirmed.
ALL CONCUR.
NOTES
[1] This allegation placed him within the jurisdiction of the Fayette Family Court. Kentucky Revised Statutes (KRS) 610.010(2)(c), 630.020(1).
[2] While a written term order was not previously entered, it was stipulated that J.S. understood he was not to leave home without permission and that he was to attend school. The lack of written terms resulted from the attempt to implement a diversion plan.
[3] During the initial disposition hearing on March 3, 2009, counsel for J.S. requested that a second hearing take place so that J.S. would have an opportunity to review the disposition report. The court scheduled a hearing for March 18, 2009, at which the gang resource officer referenced therein would testify.
[4] The officer described "sex ins" as a gang ritual used to initiate female members.
[5] J.S.'s older brother is also a gang member and was recently committed to the Cabinet as a public offender. It should be noted that attempts to avoid commitment of J.S.'s brother lasted for more than a year. However, the older brother's and parents' failure to cooperate ultimately led to the older brother's commitment. While his brother's actions should not be imputed to J.S., the officer did indicate that full cooperation by J.S.'s parents was necessary for his protection.
[6] At various stages of this proceeding it was suggested that commitment based on J.S.'s family's inability to relocate rendered this a dependency, abuse and neglect case. However, the Court's consideration of the family's ability to relocate merely illustrates its attempts to find a less restrictive alternative to commitment. It was J.S.'s involvement with the gang that necessitated his relocation and ultimate commitment. There is no indication that J.S.'s family was unable to provide a suitable home for J.S., but that J.S.'s actions rendered the location of his home unsuitable.